UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| ADENIRAN OYEBADE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CASE NO.:  1:11-cv-0968-JMS-DML |
| | ) | |
| BOSTON SCIENTIFIC CORPORATION, | ) | |
| | ) | |
| Defendant. | ) | |

## Order on Defendant's Motion to Dismiss or, Alternatively, for Evidentiary Limits (Dkt. 74)

This matter is before the court on a motion (Dkt. 74) by defendant Boston Scientific Corporation for sanctions against plaintiff Adeniran Oyebade because of his conduct in discovery.  Boston Scientific sought dismissal of the plaintiff's complaint or, alternatively, limits on evidence that may be presented on summary judgment or at trial, as well as attorneys' fees and expenses incurred in bringing the motion and "rooting out" and attempting to mitigate Mr. Oyebade's alleged discovery misconduct.  On July 10, 2012, Judge Magnus-Stinson determined that the ultimate sanction of dismissal is not warranted but other sanctions are.  She referred the motion to this magistrate judge "for determination of the appropriate level of sanctions, short of dismissal."  (Dkt. 96).

### Background

Boston Scientific argues that Mr. Oyebade's conduct in discovery with respect to six matters warrants sanctions.  It contends that Mr. Oyebade has engaged in the following improper conduct:

1.  Destroying an audio recording of a meeting on April 19, 2010, among him, human resources representative Natalie Hardin, and quality control manager Jennifer Walls, and making false or evasive statements regarding the recording.

2.  Making false or evasive statements regarding the availability of documents about his military service and naturalization from a lawyer who represented him in litigation concerning these matters.

3.  Making false or evasive statements regarding the contents of a notebook and failing properly to produce the contents of the notebook.

4.  Making false or evasive statements regarding the completeness of his document production.

5.  Making false or evasive statements regarding his self-employment or consulting work while employed by Boston Scientific.

6.  Exhibiting a pattern of false or evasive deposition testimony, including testimony about the recording of the April 19, 2010 meeting, his military service and discharge from the military, and his self-employment and consulting work while employed at Boston Scientific.

Mr. Oyebade denies that any of his conduct has been improper or, at least, that he has not purposefully shirked his discovery responsibilities or interfered with Boston Scientific's discovery rights.

## **Legal Framework**

Before discussing the evidence and the parties' positions regarding the discovery matters raised by the present motion, the court first discusses its authority to impose sanctions. In this case, of course, any sanction will not include dismissal of Mr. Oyebade's complaint, as Judge Magnus-Stinson has ordered.

Both the court's inherent power and Rule 37 of the Federal Rules of Civil Procedure supply the court with broad authority to sanction parties who abuse the judicial system. Litigants, their lawyers, and the court are entitled to a judicial system of integrity and fairness. *See Greviskes v. Universities Research Ass'n, Inc.,* 417 F.3d 752, 758-59 (7th Cir. 2005).

Sanctions are imposed for two purposes: to penalize parties who do not follow the rules and to deter others who might be tempted to engage in abusive conduct. *Id.* at 759; *Philips Medical Sys. Int'l, B.V. v. Bruetman,* 982 F.2d 211, 214 (7th Cir. 1992).

### A.  The Court's Inherent Power

The court has the inherent power to protect the integrity of the judicial system and punish those who abuse it by fashioning a sanction proportional to the abusive conduct. *Chambers v. NASCO, Inc.,* 501 U.S. 32, 44-45 (1991); *Allen v. Chicago Transit Auth.,* 317 F.3d 696, 703 (7th Cir. 2003) (sanction under court's inherent power "should be proportioned to the gravity of the offense"). Punishment may include even the "ultimate" sanction of dismissal or default and the award of the opposing party's fees and expenses. *Chambers,* 501 U.S. at 55 (affirming district court's order requiring disobedient party to pay all his opponent's attorneys' fees and expenses of more than $1 million); *Greviskes,* 417 F.3d at 758 (court may rely on its inherent power to dismiss a case because of a party's bad faith conduct in litigation). In selecting a sanction, the court should consider "the egregiousness of the conduct in question in relation to all aspects of the judicial process." *Dotson v. Bravo,* 321 F.3d 663, 667-68 (7th Cir. 2003) (internal quotation omitted).

### B.  Rule 37 Sanctions

Rule 37 gives the court authority to sanction a party for discovery misconduct, in particular. A party's failure to comply with discovery orders is misconduct subject to sanctions under Rule 37(b). Making evasive or incomplete disclosures in response to document requests or interrogatories, or in answering deposition questions is another type of discovery misconduct. Rule 37(a)(4). That behavior is treated as a failure "to disclose, answer, or respond," *id.,* and Rule 37(d) permits sanctions under Rule 37(b) to be imposed for that conduct. A party's failure

to provide information that was required as part of initial disclosures under Rule 26(a) or under the obligation to supplement discovery under Rule 26(e) is discovery misconduct too.  Discovery misconduct may be sanctioned in any "just" manner, including imposition of various types of sanctions listed in Rule 37(b)(2)(A).  Further, an award of attorneys' fees incurred in bringing or responding to a discovery motion must be made in favor of the winning party unless the other's conduct or position "was substantially justified or other circumstances make an award of expenses unjust."  *See* Rule 37(b)(2)(C) and 37(d)(3).

Rule 37 sanctions are appropriate where a party displays willfulness, bad faith, *or* fault in violating his discovery obligations.  *Marrocco v. General Motors Corp.,* 966 F.2d 220, 224 (7th Cir. 1992) (citing *National Hockey League v. Metropolitan Hockey Club, Inc.,* 427 U.S. 639, 640 (1976)).  Willfulness or bad faith may be inferred through a party's "pattern of contumacious conduct or dilatory tactics," and that conduct can lead to the harshest of sanctions.  *Crown Life Ins. Co. v. Craig,* 995 F.2d 1376, 1383 (7th Cir. 1993).  *See also Newman v. Metropolitan Pier & Exposition Auth.,* 962 F.2d 589, 591 (7th Cir. 1992) (affirming sanction of default where, although district court had not made a finding of bad faith, the party's failure to comply with discovery obligations was part of a pattern of noncompliance rather than inadvertent, isolated, or merely careless); *Downs v. Westphal,* 78 F.3d 1252, 1257 (7th Cir. 1996) (affirming default judgments against *pro* se defendants where evidence of their bad faith conduct was overwhelming; they rivaled only each other in their level of untruthfulness).

"Fault" as a ground for imposing Rule 37 sanctions considers whether the party's discovery conduct demonstrates objectively a lack of reasonableness.  *Marrocco,* 966 F.2d at 224.  A party's "extraordinarily" poor judgment or "gross" negligence as opposed to a mere mistake or carelessness may warrant harsh Rule 37 sanctions.  *Id.* (directing verdict in favor of

plaintiff where defendant flagrantly disregarded its duty "to preserve and monitor the condition of evidence which could be pivotal in a lawsuit").

The guiding principle in selecting Rule 37 sanctions is that sanctions must be proportionate to the offense—the punishment must fit the crime. *Maynard v. Nygren,* 372 F.3d 890, 893 (7th Cir. 2004) (affirming dismissal of plaintiff's complaint for discovery-related perjury and concealment of documents); *Stookey v. Teller Training Distributors, Inc.,* 9 F.3d 631 (7th Cir. 1993) (affirming entry of default against a defendant and damages award exceeding $500,000 where defendant failed to comply with discovery orders, sabotaged the conduct of a deposition, produced altered documents, and otherwise caused unnecessary and prejudicial delay).

## Analysis of Alleged Discovery Misconduct

### A. Mr. Oyebade engaged in bad faith discovery misconduct regarding the recorded April 2010 meeting.

Mr. Oyebade was employed as a professional quality engineer at Boston Scientific's Spencer, Indiana facility, and was responsible for investigating complaints about Boston Scientific products. His complaint in this case asserts, in part, that Boston Scientific unlawfully discriminated against him because of his race and national origin, and retaliated against him for having earlier complained of discrimination, when it terminated his employment on May 4, 2010. He filed an EEOC charge of race and national origin discrimination in February 2010, a second charge in early April 2010 asserting retaliatory conduct, and a third charge in June 2010 based on the termination of his employment.

One of the key events in the narrative underlying his claims (so identified by both sides) is an April 19, 2010 meeting that took place in Natalie Hardin's office. She is the director of Human Resources at the Spencer facility. Mr. Oyebade was instructed to report to Ms. Hardin's

5

office, at which Ms. Hardin and Jennifer Walls Reynolds were present.  Ms. Walls Reynolds is a

quality assurance manager and the supervisor of Mr. Oyebade's quality assurance supervisor.

According to both parties, during the meeting (sometimes hereafter, the "Hardin-Walls

meeting"),[1] Mr. Oyebade said he was going to record their conversation.  Boston Scientific

asserts that the conversational exchanges during this meeting provided one of the bases on which

it decided (properly, in its view) immediately to suspend Mr. Oyebade's employment, although

with pay.  Mr. Oyebade intends to recount his version of the exchanges at the Hardin-Walls

meeting as evidence supporting his claims of race discrimination and retaliation.

    1.  Boston Scientific requested all recordings.

      Boston Scientific's initial discovery requests to Mr. Oyebade required him to produce

any recordings (audio, visual, or digital) or transcripts of recordings of any discussions between

him and any employees or representatives of Boston Scientific, including any audiotapes he

referenced at the initial pretrial conference when he told counsel for Boston Scientific that he had

"thousands of documents and audiotapes" related to his claims. (*See* document requests 7 and 24,

Dkt. 75-1).  Any audio or visual or digital recording possessed by Mr. Oyebade, including of the

Hardin-Walls meeting, fell within the requested discovery.   In response, Mr. Oyebade produced

a CD to which, he represented, he had copied his recordings.  (Dkt. 75-2 at pp. 1 and 4).

      The CD contained recordings of two meetings between Mr. Oyebade and Boston

Scientific personnel (one of his interview by Lynn Prust and the other of a conversation when he

returned with a police officer to the Spencer facility after his suspension), but not of the Hardin-

Walls meeting.  Its absence was conspicuous given Mr. Oyebade's statement in the meeting that

---

[1]     Ms. Walls Reynolds was known as Ms. Walls at the time Mr. Oyebade was employed by
Boston Scientific; hence, the meeting is referred to as the Hardin-Walls meeting.

he was going to record it and given a memo in the EEOC's investigative file discussing Mr.

Oyebade having played a recording of that meeting for the EEOC investigator.  A memo in the

EEOC's file (Dkt. 75-4), dated one day after the Hardin-Walls meeting, states that on April 20,

2010, Mr. Oyebade met with an investigator for the EEOC at its Indianapolis office and

explained that the previous day he had been placed on an indefinite suspension.  The memo says

that Mr. Oyebade played for the investigator a recording of the Hardin-Walls meeting, and that

memo goes on to describe the contents of the recording:

> Oyebade is in [office] this date and states on the previous day, R. [respondent
> Boston Scientific] placed him on indefinite suspension. . . . [Oyebade] played the
> undersigned a recording of the meeting he had with Natalie Harding,[2] R HR Dir.,
> and Jennifer Walls, Mgr.  The meeting begins with Harding stating CP [charging
> party Oyebade] was called into the office to discuss the customer complaint
> investigation.  Harding then asked [Oyebade] if he was recording the meeting.
> [Oyebade] replied that he was recording his comments.  Harding and [Oyebade]
> then went back and forth regarding the recording of the meeting.  Harding
> continually instructed [Oyebade] not to record the meeting as this was a violation
> of company policy.  [Oyebade], who was very agitated, ultimately informed
> Harding that she could not prevent him from exercising his rights.  There was
> then a break in the recording, and it returned with Harding stating [Oyebade]
> would be notified in writing of [Boston Scientific's] determination.

(Dkt. 75-4 at p. 4).

    2.  <u>Mr. Oyebade testified he never made a recording of the Hardin-Walls meeting.</u>

In deposition questioning, Boston Scientific asked Mr. Oyebade about the recording of

the Hardin-Walls meeting and why he had not produced it.  His testimony was combative but, in

the end, he testified that he *never* recorded the meeting.   At first, he claimed not to recall

whether he made any recordings other than of the interview by Lynn Prust and the conversation

when he returned property, though frequently answering with extraneous detail making it

difficult to determine whether he did not remember, or did remember and had or had not

---

[2]    Ms. Hardin's last name is misspelled in the memorandum as Harding.

recorded the Hardin-Walls meeting.   (Dkt. 75-3, Transcript of deposition taken Dec. 16, 2011, at

p. 45, lines 5-7; p. 46, lines 1-4; p. 47, lines 1-3).  He was asked whether he had destroyed any

tape recordings that he had made, and said "I'm not destroying any recording."  (Tr. p. 47, lines

21-25).  He was then asked whether he played recordings for the EEOC, and he said he had, but

did not know whether he played recordings that were not produced to Boston Scientific.  (Tr. p.

48, lines 6-14).  Mr. Oyebade was then asked to explain what happened to the recording of the

Hardin-Walls meeting that he had played for the EEOC investigator, as reflected in the EEOC's

file.  At this, Mr. Oyebade testified, emphatically, that he never recorded the meeting, and if a

recording exists, then it's because Natalie Hardin or Jennifer Walls recorded it:

> Q.      Where has that tape gone?
>
> A.      Which tape?
>
> Q.      The tape of the recording of your meeting with Natalie Hardin and
> Jennifer Walls.
>
> A.      I don't know the tape you are talking about.  I do not record the
> conversation between Natalie Hardin and myself.  That's where you are getting
> everything all confused.
>
> Q.      Okay.  All right.  So you did not record the meeting that you and –
>
> A.      Yes.
>
> Q.      -- with Natalie Hardin and Jennifer Walls that immediately preceded your
> suspension.
>
> A.      Yes.  Yes.  Capital yes.
>
> Q.      And such a tape never existed?
>
> A.      I don't know what you're talking about.  I don't know.  I don't know if
> any tape exists of the meeting because they might have their own recording.  It was three
> individuals in that meeting.  Jennifer Walls was my manager's manager.
>
> Q.      But you do know –

> **A.**     And Natalie Hardin, the HR director and myself, the quality engineer for the company.  So I don't know if any one of them have a recording.  If you have a recording, you need to show it to me and play it to me.  You need to play it.  And I can remember if that was my voice or not.

(Tr. p. 49, line 13 to p. 50, line 17).

Later in his deposition, Mr. Oyebade was asked again about the document written by the EEOC investigator summarizing the contents of a recording he played for her (Dkt. 75-4 at p. 4) and whether the document refreshed his recollection that he had, indeed, recorded the Hardin-Walls meeting.  It did refresh his recollection, but not that he had recorded the Hardin-Walls meeting.   Mr. Oyebade claimed to have played some different recording for the EEOC investigator, a recording he had produced in the litigation (Tr. p. 112, line 16 to p. 115, line 5), and said that references to a recording "could mean writing something down"—*i.e*., that when Mr. Oyebade said during the meeting that he was recording it, he meant only writing something down:

> **A.** Do you know the meeting [meaning] of recording?  It could mean writing something down.  Did I – perhaps you don't understand the ambiguity in the word "recording."  You can record someone by writing something down.  You can record someone by recording electronically.  The question is, did your client saw a recording device on me on that day?  Simple.

(Tr. p. 115, lines 17-24).  Mr. Oyebade challenged Boston Scientific to prove he had recorded the Hardin-Walls meeting, as with a surveillance system of the meeting, or by the EEOC investigator swearing in his presence that the recording he played for her was not one he produced in the litigation.  (Tr. p. 115, line 25 to p. 17, line 5).

3. The EEOC investigator confirms the accuracy of her April 10, 2010
memorandum that Mr. Oyebade played a recording of the
<u>Hardin-Walls meeting.</u>

The court has an affidavit from the EEOC investigator, Dkt. 75-4, in which she
authenticates her April 20, 2010 memorandum as accurate, and states that the recording played
by Mr. Oyebade was an audio recording from his cell phone.

4. <u>Mr. Oyebade's testimony and representations to the court are not believable.</u>

In response to Boston Scientific's motion, Mr. Oyebade is steadfast that no recording of
the April 19, 2010 meeting ever existed: "Plaintiff reiterate that there is <u>no</u> electronic recording
of the alleged meeting on April 19, 2010. The recording of the meeting on April 19, 2010 never
exist and it is completely impossible to destroy a recording that never exists." (Dkt. 87 at p. 3,
emphasis in original). He also suggests the EEOC investigator must have been mixed up about
recordings that she listened to. (*Id.* at 4-5). At the same time, however, Mr. Oyebade explains
that the cell phone he had with him at the EEOC's office on April 20, 2010, has long since been
replaced and he says: "Even if any recording were to exists in a cell phone, where on earth
would Plaintiff retrieved the cell phone that he no longer owned or maintained." (*Id.* at 4). He
informs the court that because he felt he had been victimized by workplace harassment and
retaliation before the April 19 Hardin-Walls meeting, he had good reasons to want to record any
conversations "because if anything happened to him it could be his words against their words
without any means of proving what happened." (*Id.* at 6). He explains too that recording "illegal
harassment conversations" could never properly be forbidden by an employer. (*Id.* at 5).

As the court was reading these explanations, it expected Mr. Oyebade to admit that he
had made an audio recording of the Hardin-Walls meeting on April 19, 2010, had played the
recording for the EEOC investigator the next day, had mistakenly failed to keep a copy of the

recording when he changed cell phones and cell phone carriers, and to attempt somehow to explain his contrary deposition testimony.  But Mr. Oyebade remains adamant that the only recording he ever made of the Hardin-Walls meeting was a writing in his notebook prepared April 19, 2010, and produced in the litigation.  (*Id.* at p. 4).

Mr. Oyebade's testimony and his statements to the court that he never made a recording of the Hardin-Walls meeting are not believable.   Without an audio recording, the EEOC investigator would not have been able to summarize the contents of the Hardin-Walls meeting in the manner she did in her April 20, 2010 memorandum.  In addition to its reference to Mr. Oyebade "playing" a recording and its detail about the contents of the conversation she listened to, the memorandum notes a "break in the recording" and it resuming with comments from Ms. Hardin that Mr. Oyebade will be notified in writing of Boston Scientific's determination.  (Dkt. 75-4 at p. 4).  These details are consistent only with the investigator's listening to an audio recording—not with a discussion of written notes.  Further, Mr. Oyebade's recording of the meeting was a main topic of the meeting itself and an impetus for discord between him and Ms. Hardin.  The notion that Mr. Oyebade and Ms. Hardin were clashing over whether Mr. Oyebade could write things down and not about his making an audio recording of a meeting with HR is not rational.  Moreover, his backpedaling—suggesting that it could have been a lost cell phone recording—is obviously inconsistent with his denials that he made a recording.  This is not an occasion for "pleading in the alternative."  All credible evidence points to Mr. Oyebade having made an audio recording of the Hardin-Walls meeting.

    5.    The court is convinced that Mr. Oyebade spoliated evidence.

The court is convinced that (a) Mr. Oyebade made an audio recording of the Hardin-Walls meeting; (b) at some point Mr. Oyebade destroyed, or knowingly failed to maintain, the

recording when he knew of its importance to his claims; and (c) he has tried to cover up the destruction by falsely claiming, under oath and in his statements to this court, that he never recorded the meeting.

The evidence also reveals that Mr. Oyebade may have been motivated to destroy the recording because its contents would constrain his testimony about the meeting.   In the briefing of the present motion (as well as in other filings with this court) Mr. Oyebade has advanced a new, detailed narrative of his recollection of the Hardin-Walls meeting.  In that narrative, Mr. Oyebade now contends that Ms. Hardin and Ms. Walls told him he "must listen and submit to everything we are going to say," and agreed with him it was just like "the SLAVE and the SLAVE's MASTER."   He also now says that during this meeting he said, "I am NOT recording this conversation but I will write down everything you are going to say in this matter on this piece of paper in front of me," to which Hardin and Walls said "that's fine."  But they still wanted to read to him Boston Scientific's policy against recording and when he said please don't, he was suspended for failing to cooperate.  (*Id.*)

The court observes that this new narrative finds no support in notes about the meeting Mr. Oyebade made during or shortly after the meeting.   Mr. Oyebade has produced in this case a page from a notebook (a composition notebook that students typically use) that he represented to the court and to Boston Scientific contained his handwritten notes of the Hardin-Walls meeting and which he wrote down on the day of, or near the day of, the meeting.  This page (along with what Mr. Oyebade represented were the entire contents of his notebook) was first submitted to the court for *in camera* inspection in January 2012 for the court's ruling on whether the work product doctrine protected the notebook pages from disclosure to Boston Scientific.  Nothing about a "slave" or a "slave's master" or "recording" the meeting by writing things down appears

on the notebook page Mr. Oyebade represented months ago was his contemporaneous summary of the Hardin-Walls meeting.  There appears to be no evidentiary support for Mr. Oyebade's new narrative except Mr. Oyebade's purported recollection, and he apparently intends to testify consistently with it, unrestrained by an audio recording of what actually was said.   (Dkt. 87 at pp. 7-8).[3]

A recording—assuming it is audible, complete, and not tampered with—would provide indisputable evidence of the words used by each person during the Hardin-Walls meeting.  It would be unnecessary to allow the participants to testify about his or her recollection of the conversation and none could rely on a version of the conversation incompatible with the recording.  Without the audio recording—which Mr. Oyebade had made, was in his possession, and was played by him for the EEOC investigator back in 2010—the conversational exchanges during the Hardin-Walls meeting could be a disputed issue between the parties.

**B.  Mr. Oyebade engaged in discovery misconduct regarding documents available from a lawyer who represented him in a naturalization matter.**

One way Boston Scientific intends to defend against Mr. Oyebade's claims is to show that Mr. Oyebade's emotional distress is not causally related to Boston Scientific's conduct, and that his reactions to workplace events were not reasonable but extremely idiosyncratic and symptomatic of his overall mental health.  Boston Scientific believes that these mental health issues are revealed in part by circumstances surrounding his discharge from the United States Navy.  Boston Scientific knew from public records that Mr. Oyebade had relied on his Navy service as a ground for expedited naturalization as a United States citizen and that the

---

[3]     The narrative contained in the response brief is apparently Mr. Oyebade's "transcript" recollection of the meeting.  Boston Scientific's discovery requests sought all transcripts of all meetings but before his response brief, Mr. Oyebade had never supplied this version of the Hardin-Walls meeting.  *See* Boston Scientific's reply brief, Dkt. 89, at p. 5.

government had denied his application for naturalization, in part finding that his service in the Navy did not qualify as "honorable" service. Those records indicate that Mr. Oyebade was deemed an "erroneous entry" into the service based on mental health issues, and that he had sued the government seeking judicial review of the government's denial of his application for naturalization. Mr. Oyebade was represented by attorney Herbert Igbanugo in that litigation.

Boston Scientific sought in discovery information from Mr. Oyebade regarding the circumstances surrounding his service with and discharge from the Navy, which occurred in 2007. At the first day of his deposition in December 2011, Mr. Oyebade claimed he could not recall how long he served in the Navy, whether he completed basic training, or whether he was ever at sea. He also refused to say whether any mental issue bore on his discharge from the Navy or whether he believed he suffered from any mental issue before his employment at Boston Scientific. As to his service generally in the Navy and the circumstances of his discharge, Mr. Oyebade told Boston Scientific it could get his information from the Navy itself, and he apparently signed an authorization for release of his records. (Tr. at p. 126, line 2 to p. 137, line 7; at p. 145, line 10 to 146, line 9; p. 149, line 14 to p. 153, line 2). In general, Mr. Oyebade would not answer questions about his military service because he believed that the information was privileged or that Boston Scientific should obtain the answers from the Navy itself, or because he claimed not to know the answers without official Navy documents. (Tr. at p. 135, line 22 to p. 136, line 18).[4]

---

[4]     Mr. Oyebade testified: "So I do not recall any information about my service. Thank you. If you need, I've given you the guidelines. My service was less than six months. . . . So if, when you get these documents, you need to review it. It will tell you – the document is going to tell you when I joined the Navy and when I was discharged. Trust me. When the government tells you – it will also tell you the reason for discharge. So all of this information, I've given you the free hand to have access to it. I signed the document you gave to me. So you have access to it, you review it, you'll be able to make that determination yourself. But without having the

Regarding his lawsuit against the government for rejecting expedited naturalization, Mr. Oyebade refused to answer any questions because he viewed questions about his immigration and military status as "privileged," and said that Boston Scientific should take up any questions with Mr. Oyebade's lawyer in the immigration matter, Mr. Igbanugo.  (Tr. at p. 137, line 24 to p. 140, line 9).

Because of Mr. Oyebade's refusal to answer questions—at least in the absence of documents—and the vagueness of his testimony regarding his military service and naturalization efforts, Boston Scientific (1) served supplemental document requests to Mr. Oyebade regarding his naturalization application and, later, (2) a documents subpoena on attorney Mr. Igbanugo for all documents related to his representation of Mr. Oyebade except those to which a privilege objection is made.  Mr. Oyebade then took actions and made statements improperly to thwart these discovery efforts.  First, he implied to Boston Scientific that he had contacted Mr. Igbanugo and learned that the files related to his representation no longer exist.  He said:

> I am happy to share with you the efforts made in the attempt to review [naturalization] documents and provide it to you. As you advised in the supplemental request where you states:  If you have any difficulty obtaining records responsive to our request regarding your N-400 Application you should contact the attorney who represented you and request your case file.
> I did exactly as you have advised and my attorney, Mr. Herbert Igbanugo of the law office of Igbanugo International Law P.L.L.C., www.igbanugolaw.com told me that he only keep client's file for a maximum of three years after which the files will no longer be available.

(Dkt. 75-6 at p. 2).  Next, when Boston Scientific served a Rule 45 documents subpoena on Mr. Igbanugo, Mr. Oyebade moved to quash the subpoena on the ground that Mr. Igbanugo would

---

document in front of me, I cannot tell you about a document I don't have in front of me.  And I'm under oath.  You want you to give you inaccurate information.  That's not possible.  I'm not going to do that." (*Id.*).  At other places, he emphasized that he would not answer questions about the military or his mental health unless Boston Scientific put a document in front of him, and if it did, then he would answer whether information in the document is true or not.  (Tr. at p. 149, line 14 to p. 152, line 2).

charge him fees to respond to the subpoena.  That was an erroneous description of Mr. Igbanugo's email statement to Mr. Oyebade regarding the subpoena.  The court denied the motion to quash.

Boston Scientific contends in the present motion that Mr. Oyebade "plainly lied" about having contacted Mr. Igbanugo and learning that his files were no longer available.  Mr. Oyebade has responded with the same sort of word manipulations that have characterized his discovery conduct.  He says his statement about learning that Mr. Igbanugo disposes of files after three years was not meant to convey whether Mr. Oyebade's own file still existed.  He refuses to disclose the contents of his conversation, if any, with Mr. Igbanugo regarding the existence of his files, and says only that he learned from the attorney (he does not say when) that files older than three years may not be available.  The court finds that in context, Mr. Oyebade's statements and actions demonstrate an affirmative effort to, without justification, impede and frustrate Boston Scientific's access to non-privileged information regarding his service with the Navy, his efforts at naturalization, and the mental health issues relating to those matters.

### C.  Mr. Oyebade engaged in discovery misconduct regarding his notebook.

During a January 4, 2012 telephone conference with the court, the parties discussed a notebook that Mr. Oyebade had mentioned during depositions or had with him at depositions.  During the conference, Mr. Oyebade explained that his notebook contains about 20 or 30 pages, that some of the pages are notes he wrote to prepare for questioning witnesses at depositions, that some pages are notes he wrote during meetings when he was employed by Boston Scientific, and that some pages are notes regarding other matters.  The court ordered Mr. Oyebade to email copies of *all of the notebook pages* to the court for *in camera* review for relevance and privilege. Mr. Oyebade provided nine pages in response to that order, which the court reviewed, and

addressed in an order dated April 9, 2012.  (Dkt. 42).  One of the nine pages appeared to be notes regarding the April 19, 2010 Hardin-Walls meeting, which the court ordered Mr. Oyebade to produce. The other eight pages were notes made during the litigation and were work product, and the court ruled that Mr. Oyebade was not required to produce those pages.  The court also noted that it was not clear that Mr. Oyebade had provided all contents of the referenced notebook, and ordered him to provide to Boston Scientific a certification, under the penalties for perjury, that he had provided all contents of the notebook to the court.  (*Id.*).  According to Boston Scientific, Mr. Oyebade represented that he had produced "all" of the notebook pages to the court for its *in camera* review.

However, in response to Boston Scientific's motion for sanctions, Mr. Oyebade sought permission, which the court granted, to submit the notebook itself for the court's *in camera* review.  The notebook contains 17 pages of notes that Mr. Oyebade did not submit in January 2012.  He explains that the difference between the contents of the pages of the notebook now and as they existed on January 18, 2012, when he submitted nine pages for *in camera* review, is because "[f]ew pages of the notebook have been updated based on the deposition questions and review of plaintiff's work documents that he had printed out from his work laptop computer before he was wrongfully terminated."  (Dkt. 87 at p. 11).

The court finds that explanation unworthy of belief.   It is clear to the court that when Mr. Oyebade submitted the contents of his notebook by email to the magistrate judge's chambers on January 18, 2012, he excluded from his submission some pages that existed within the notebook at that time.  It further appears that he is attempting to cover up having excluded some pages by labeling them (usually in different ink from the contents themselves) as having been prepared on "01/20/2012," two days after his original *in camera* submission.

17

The front page of the notebook is titled "Trainings/Meetings/Reference Note, CIS-Spencer," and the first six pages of the notebook are writings regarding training or meetings or that reference information particular to Mr. Oyebade's job responsibilities as a quality engineer. It appears highly likely that the information on these pages—described below—existed at the time of the initial *in camera* submission, and Mr. Oyebade misled the court and Boston Scientific.

- The first page of the notebook are notes of a February 19, 2009 "complaint update meeting," written in black ink, and a February 20, 2009 "meeting with Brian" regarding "405 complaints" about some particular device, written in red ink. Mr. Oyebade wrote (at some point) at the top of the page "Personal Note/Reviews on 01/20/2012." [5]

- The second page contains notes regarding a complaint investigation protocol for a particular device, some of which is written in red ink and some in black ink. In black ink at the top of the page, Mr. Oyebade wrote (at some point) "Personal notes on investigation process."

- The third page are notes regarding the distinction between a manufacturing or design cause for a product problem.  In black ink at the top of the page, Mr. Oyebade wrote (at some point) in different ink from the rest of the page the words "personal note on terms."

- The fourth page are notes regarding "meeting with Bush Girl and B.S. and M.S." and the distinction between design or human handling as a cause for a product problem.

- The fifth page are notes regarding an ACCUSTICK product and filling in until "Mark's replacement."

- The sixth page are notes regarding "Blood Born Pathogen Training" on March 10, 2010.  In black ink at the top of the page, Mr. Oyebade wrote (at some point) "Training review 01/20/2012."

---

[5]  This date notation likely was written sometime after Mr. Oyebade made his *in camera* submission on January 18.  One of the pages Mr. Oyebade submitted then (the one regarding the Hardin-Walls meeting) now has a note at the top written in black ink that did not exist on January 18.

These pages, appearing as they do to have been created in the course of Mr. Oyebade's employment, must be produced to Boston Scientific.[6]

Two other pages of the notebook appear to contain Mr. Oyebade's recollections of the contents of two meetings with Lynn Prust during the course of his employment.   One page contains as its first line:  "Complaints reported on Jan. 26 '10."  The other is titled "25MAR2010 Meeting with Lynn Prust."   Though it is not clear that the notes were recorded contemporaneously with the meetings, Mr. Oyebade has not demonstrated that they are work product, and they must be produced.  (*See* note 6 *supra*).

Three of the other "new" pages in the notebook appear to have been written by Mr. Oyebade in connection with the filing of his EEOC charges before his employment was terminated.  They are written in black ink under the title "Important Dates Review on 01/20/2012," and describe events beginning January 25, 2010, and ending February 26, 2010. The court suspects the title was written after the January 18, 2012 *in camera* review, and that these three pages were contained in the notebook at that time but not submitted to the court. These pages are located within and among a group of all the other pages in the notebook that appear to have been written at some point during the course of Mr. Oyebade's employment. They too must be produced.  (*See* note 6 *supra*).   All of Mr. Oyebade's notes regarding depositions during this litigation are separated, and start after, the "employment" pages.

The remaining new pages relate to events that happened after January 18, 2012, are work product, and may be withheld from production by Mr. Oyebade.  They are:  (a) the four pages of deposition questions for the "05/01/12 Jeremiah Akinnola Deposition" and (b) the two pages of deposition questions for the "06/01/12 Erik Shonk Depo."

---

[6]     Because the court currently possesses the notebook, it will make these pages available, in a sealed manner available to case participants only, on September 19, 2012.

Based on its review of the original notebook and comparing the contents to the nine pages submitted for *in camera* review on January 18, 2012, the court determines that Mr. Oyebade was not forthright with the court or Boston Scientific when he made his January 18, 2012 *in camera* submission.  His response brief, filed June 11, 2012, similarly attempts to mislead the court regarding the true contents of the notebook as they existed on January 18, 2012.

### D.  Mr. Oyebade improperly withheld documents.

On March 16, 2012, following a telephone discovery conference with the court regarding numerous discovery issues—including whether Mr. Oyebade had thoroughly searched for responsive documents or was withholding documents from discovery—Mr. Oyebade sent an email to Boston Scientific to "confirm the production of all responsive documents to your discovery requests.  As [mentioned] to the court, if any document surfaces by any means either through research, misplaced items including bags, luggage, or through any means at [my work or home], it would be produced to you in a timely fashion. . . ."  (Dkt. 75-8).[7]  About one month later, Mr. Oyebade made filings with the court that included numerous documents responsive to earlier document requests but that had never been produced.  The documents concerned his naturalization and military service, tax issues, and his prior marriage.[8]

Boston Scientific argues that Mr. Oyebade's March 16, 2012 email was not truthful because he later filed with the court numerous responsive documents that had not been produced. In response, Mr. Oyebade contends the court should not infer that he intentionally withheld

---

[7]    On April 9, 2012, the court ordered Mr. Oyebade to provide, under oath, specific information to Boston Scientific regarding the nature of his searches for documents responsive to discovery requests and whether he had produced all responsive documents.  The court did so because of evasive statements by Mr. Oyebade concerning these matters.  (Dkt. 58).

[8]    Mr. Oyebade filed some of these documents on an *ex parte* basis, but the court unsealed them for viewing by party participants.

documents, and should infer instead that some documents (he does not say which ones) were actually discovered by him after March 16, 2012.  ("How does a supplementary document found and produced to a party constitute a misrepresentation or misconduct."  Dkt. 87 at p. 12).  As to others, Mr. Oyebade claims that he did not mean to violate his discovery obligations, but was concerned about providing sensitive and private documents and was seeking the court's guidance before producing them. [9]  Mr. Oyebade's belief that information could be withheld because it was sensitive or personal was addressed by the court in January 2012.  During a lengthy telephone conference on the record on January 4, 2012, the court explained to Mr. Oyebade that he could not refuse to provide information about pertinent matters just because he considered the information sensitive or "personal and confidential." (Dkt. 23 at p. 34).  The court also explained the need, with respect to documents, to describe in a privilege log any document withheld from disclosure on the basis of privilege.  (*Id.* at 30-31).

Mr. Oyebade ignored the court's prior guidance and instructions when he knowingly withheld some documents from discovery—tax documents, naturalization documents, military service documents, marriage documents—because of his belief they concerned "private" or "sensitive" matters, while at the same time informing Boston Scientific he had produced *all* documents responsive to its discovery requests.[10]

---

[9]     Mr. Oyebade also defends his conduct by contending that Boston Scientific has not produced all relevant, non-privileged responsive documents or has otherwise engaged in discovery misconduct.  Many of the things about which Mr. Oyebade complains have been addressed by the court in other orders.  If they have not, it is because they have not been properly raised by motion.  In any event, none of the matters discussed by Mr. Oyebade excuses his own discovery misconduct.

[10]     Boston Scientific initially claimed that Mr. Oyebade also had withheld a Positive Award Certificate that he received during his employment.  Mr. Oyebade's response brief shows that this document was produced, and asserts that Boston Scientific therefore lied to the court.

### E.  Mr. Oyebade engaged in discovery misconduct regarding other employment or consulting work while employed by Boston Scientific.

Boston Scientific has explored in discovery whether and to what extent Mr. Oyebade was engaged in other employment while he was employed and paid by Boston Scientific.  Mr. Oyebade's tax return for 2009 claims a business loss of nearly $40,000, and over 41,000 miles of business-related travel.  (*See* Dkt. 65-5 at p. 22; deposition transcript, Dkt 75-3, at p. 108, lines 3-5).  This information suggests significant time and effort were devoted by Mr. Oyebade to a side business in 2009 separate from his work at Boston Scientific (or misinformation in his tax return), yet when asked about other employment or work while with Boston Scientific, Mr. Oyebade claimed not to know or recall whether he engaged in any other business and not to know details about a consulting business for which he deducted expenses on his tax returns.  (Tr. at p. 101, line 22 to p. 104, line 14; at p. 109, lines 1-6).  For example, in response to the question whether he engaged in "some other business during the period when you were working full time at Boston Scientific," he said, "It may be possible, but I don't know."  (Tr. at p. 109, lines 1-4).  Later discovery uncovered a letter written by Mr. Oyebade to the IRS dated January 9, 2012, Dkt. 65-5 at pp. 22-38 (less than a month after his deposition), in which he provided numerous details and documents regarding his non-Boston Scientific income and employment during 2009.

Boston Scientific's attempts to learn through written discovery requests about other work engaged by Mr. Oyebade also elicited evasive responses.  In January 2012, Boston Scientific served supplemental document requests regarding other work engaged in by Oyebade.  Mr. Oyebade did not respond, and when Boston Scientific asked for a response, he said the requests were overbroad, unduly burdensome, and harassing, but even so he had already given

---

Boston Scientific's reply brief admits the document was produced and apologizes for its mistake in initially claiming it was not produced.

"complete answers."  His formal response to the request directed Boston Scientific to go over all his 1,137 documents and it "should be able to identify my responses accordingly."  Most of the information Boston Scientific ultimately received regarding his consulting work was the tax documentation he filed *ex parte* with the court on April 18, 2012 (Dkt. 65) and that the court ordered must be made available to Boston Scientific.

The court is convinced that Mr. Oyebade purposefully evaded questions about his other work activities, and his answers that he did not recall the work were false.  He has no justification for his evasive testimony, nor for his attempts to prevent Boston Scientific from obtaining relevant documents.

### F.  Mr. Oyebade's conduct demonstrates a pattern of abuse.

This order describes numerous subject matters about which Mr. Oyebade provided deposition testimony that is demonstrably false or misleading, or was purposefully evasive in discovery.  During the January 4, 2012 conference, this magistrate judge warned Mr. Oyebade that his evasive and obstructionist deposition testimony—given during his December 2011 deposition—was improper and would not be tolerated.   The court's warning did not have the desired outcome, as later developments in this case have revealed.

As the previous discussion demonstrates, Mr. Oyebade was untruthful with the court and Boston Scientific when he submitted nine pages of his notebook for *in camera* inspection and represented that those nine pages constituted the entire contents as of January 18, 2012.  He knowingly withheld documents from production purportedly on "sensitivity" grounds even though the court already had explained that was an improper ground for withholding information.  He misrepresented that he had checked with attorney Igbanugo regarding the availability of documents and misrepresented that Mr. Igbanugo no longer possessed documents

relating to his representation in the naturalization matter.   He destroyed—or knowingly or recklessly failed to maintain—the audio recording of the Hardin-Walls meeting, knowing its importance as evidence regarding his claims, and has made false statements under oath and in court filings regarding his audio recording of the meeting.

### Sanctions

Mr. Oyebade's discovery misconduct requires severe sanctions.

Sanctions requested by Boston Scientific short of dismissal relate specifically to the Hardin-Walls meeting and Mr. Oyebade's spoliation of the audio recording of that meeting.  It requests that the court (1) instruct the jury that Mr. Oyebade had made an audio recording of the meeting and then destroyed it; (2) prevent Mr. Oyebade from presenting his own evidence regarding the Hardin-Walls meeting; and (3) instruct the jury that Boston Scientific's evidence about the meeting must be accepted by the jury as accurate and uncontroverted.

Just sanctions for spoliation of evidence include "barring evidence or arguments, permitting adverse inferences, and dismissing claims." *Krumwiede v. Brighton Assoc., L.L.C.,* 2006 WL 1308629 at *9 (N.D. Ill. May 8, 2006).  *See also* Fed. R. Civ. P. 37(b)(2)(A)(i)-(vi) (listing types of sanctions available for discovery misconduct, which include prohibiting the disobedient party from supporting or opposing designated matters or introducing designated matters into evidence).  In addition, the jury may be instructed that a party spoliated evidence and to accept certain facts as established for purposes of the case.  *See* Rule 37(b)(2)(A)(i) (discovery sanctions may include an order that certain facts must be taken as established as the prevailing party claims); Rule 37(c)(1)(C) (allowing court to inform jury of a party's failure to disclose evidence).  *See also Large v. Mobile Tool Internat'l, Inc.,* 2008 WL 2116967 at *7-8 (N.D. Ind. May 20, 2008) (prohibiting party from presenting expert testimony regarding failure

of equipment when the party had disposed of the equipment when it knew it was relevant to litigation, and holding that jury would be informed of the spoliation and permitted to draw an adverse inference); *Larson v. Bank One Corp.,* 2005 WL 4652509 at *15 (N.D. Ill. Aug. 18, 2005) (barring defendant from challenging certain testimony from plaintiff's expert and agreeing to instruct the jury on the limits on testimony and the reasons for them).

The court agrees that the "adverse inference"-type sanctions, as those requested by Boston Scientific, are just and proportional to Mr. Oyebade's serious misconduct in his spoliation of the audio recording and false statements in deposition and to this court about the making of the recording, its destruction, and his playing of the recording for the EEOC investigator.   Indeed, the magistrate judge believes those sanctions do not fully account for all of the serious misconduct committed by Mr. Oyebade.  Particularly, the sanctions do not redress Mr. Oyebade's misleading, if not outright false, statements to the court and Boston Scientific regarding the complete contents of his notebook as of his *in camera* submission on January 18, 2012. **ANY FURTHER MISCONDUCT BY MR. OYEBADE WILL RESULT IN THIS MAGISTRATE JUDGE'S RECOMMENDATION THAT ALL HIS CLAIMS BE DISMISSED WITH PREJUDICE.**

Moreover, both Rule 37 and the court's inherent power permit it to award to Boston Scientific attorney fees related to the discovery misconduct.  Boston Scientific seeks an order requiring Mr. Oyebade to pay the attorneys' fees and costs it incurred in seeking redress for Mr. Oyebade's discovery misconduct, including drafting and filing its motion for sanctions, obtaining the affidavit from the EEOC investigator, conducting supplemental and third-party discovery in an attempt to gather information that Mr. Oyebade would not provide (or claimed he could not recall) in his deposition, and securing leave to conduct and make arrangements for Mr.

Oyebade's continued deposition.  The magistrate judge agrees the recovery of these fees is an appropriate, proportional, and just sanction.  Boston Scientific has proved Mr. Oyebade engaged in willful discovery misconduct that has significantly interfered with the just and expeditious resolution of this case.  At a minimum, Mr. Oyebade should pay the reasonable attorneys' fees and expenses Boston Scientific incurred to root out Mr. Oyebade's discovery misconduct and bring these matters to the court for resolution.

## Conclusion

For the foregoing reasons, the court imposes the following sanctions on Mr. Oyebade for his pattern of discovery misconduct, including the spoliation of evidence regarding the Hardin-Walls meeting:

1. The jury will be instructed that Mr. Oyebade had made an audio recording of the meeting and then destroyed it or failed to maintain it under circumstances that suggest that the contents of the recording would not be helpful in proving his claims in this litigation;

2. Mr. Oyebade is not permitted to present *any* evidence regarding the Hardin-Walls meeting, either at trial or for summary judgment purposes;

3. The jury will be instructed that Boston Scientific's evidence about the meeting must be accepted by the jury as accurate and uncontroverted, and the court will deem it so for summary judgment purposes as well;

4. Boston Scientific is entitled to an award of its reasonable attorneys' fees and expenses incurred to demonstrate and seek redress for Mr. Oyebade's discovery misconduct and bring these matters to the court for resolution, as set forth above.  Boston Scientific may submit its petition for these fees consistent with Local Rule 54-1.

**ANY FURTHER MISCONDUCT BY MR. OYEBADE WILL RESULT IN THIS MAGISTRATE JUDGE'S RECOMMENDATION THAT ALL HIS CLAIMS BE DISMISSED WITH PREJUDICE.**

So ORDERED.

Date: ___09/12/2012___

_Debra McVicker Lynch_
Debra McVicker Lynch
United States Magistrate Judge
Southern District of Indiana

Distribution:

Joseph C. Pettygrove
FAEGRE BAKER DANIELS LLP - Indianapolis
joseph.pettygrove@FaegreBD.com

Daniel G. Wilczek
Faegre Baker Daniels LLP
Daniel.Wilczek@faegrebd.com

ADENIRAN OYEBADE
2910 Citrus Lane
Upper Marlboro, MD 20774