UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| ADENIRAN OYEBADE, | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| *vs.* | ) | 1:11-cv-00968-JMS-DML |
| | ) | |
| BOSTON SCIENTIFIC CORPORATION, | ) | |
| *Defendant.* | ) | |

## ORDER

Presently pending before the Court are: (1) Defendant Boston Scientific Corporation's ("Boston Scientific") Motion for Summary Judgment, [dkt. 140]; and (2) *Pro se* Plaintiff Adeniran Oyebade's Motion to Supplement Response/Answers to Defendant's Motion for Summary Judgment, [dkt. 153].

## I.
## LITIGATION HISTORY

Due to the lengthy and protracted history of this litigation, the Court finds it necessary to reiterate some prior rulings that impact its review of the pending motion. Discovery disputes began early in this case, and have persisted throughout with numerous, dueling discovery-related motions. Most significantly, however, Boston Scientific moved to dismiss the case or, in the alternative, for an adverse inference instruction, and for sanctions. [Dkt. 74.] The motion was prompted by several instances of discovery misconduct by Mr. Oyebade, including misrepresentations Mr. Oyebade made regarding the existence – or non-existence as Mr. Oyebade claimed – of a recording he made of a meeting he had with a Boston Scientific Human Resources representative (Natalie Hardin) and his supervisor (Jennifer Walls-Reynolds), and his likely destruction of that recording. [*Id.*] The Court found, based on Mr. Oyebade's misrepresentations and a continued pattern of abuse, that Boston Scientific was entitled to certain adverse jury instructions

and its fees and expenses incurred in connection with addressing the discovery misconduct, and that Mr. Oyebade was prohibited from presenting any evidence regarding the meeting that he had recorded which is at issue here.  [Dkt. 109.]  Separately, the Court also sanctioned Mr. Oyebade in connection with his unwarranted termination of a deposition.  [Dkt. 126.]

## II.
### STANDARD OF REVIEW

A motion for summary judgment asks that the Court find that a trial based on the uncontroverted and admissible evidence is unnecessary because, as a matter of law, it would conclude in the moving party's favor.  *See* Fed. R. Civ. P. 56.  To survive a motion for summary judgment, the non-moving party must set forth specific, admissible evidence showing that there is a material issue for trial.  Fed. R. Civ. P. 56(e); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

As the current version of Rule 56 makes clear, whether a party asserts that a fact is undisputed or genuinely disputed, the party must support the asserted fact by citing to particular parts of the record, including depositions, documents, or affidavits.  Fed. R. Civ. P. 56(c)(1)(A).  A party can also support a fact by showing that the materials cited do not establish the absence or presence of a genuine dispute or that the adverse party cannot produce admissible evidence to support the fact.  Fed. R. Civ. P. 56(c)(1)(B).  Affidavits or declarations must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on matters stated.  Fed. R. Civ. P. 56(c)(4).   Failure to properly support a fact in opposition to a movant's factual assertion can result in the movant's fact being considered undisputed, and potentially the grant of summary judgment.  Fed. R. Civ. P. 56(e).

The Court need only consider the cited materials, Fed. R. Civ. P. 56(c)(3), and the Seventh Circuit Court of Appeals has "repeatedly assured the district courts that they are not required to scour every inch of the record for evidence that is potentially relevant to the summary

judgment motion before them," *Johnson v. Cambridge Indus.*, 325 F.3d 892, 898 (7th Cir. 2003). Furthermore, reliance on the pleadings or conclusory statements backed by inadmissible evidence is insufficient to create an issue of material fact on summary judgment. *Id*. at 901.

The key inquiry, then, is whether admissible evidence exists to support a plaintiff's claims or a defendant's affirmative defenses, not the weight or credibility of that evidence, both of which are assessments reserved to the trier of fact. *See Schacht v. Wis. Dep't of Corrections*, 175 F.3d 497, 504 (7th Cir. 1999). And when evaluating this inquiry, the Court must give the non-moving party the benefit of all reasonable inferences from the evidence submitted and resolve "any doubt as to the existence of a genuine issue for trial…against the moving party." *Celotex*, 477 U.S. at 330.

### III.
### BACKGROUND

The Court finds the following to be the undisputed facts, supported by admissible evidence in the record:[1]

Boston Scientific develops and manufactures medical instruments and technologies. [Dkt. 140-1 at 1, ¶ 1.] The Boston Scientific facility in Spencer, Indiana employs approximately 1,000 employees and "manufactures medical devices such as catheters, stents, and other products for multiple surgical specialties including urology, endoscopy and peripheral intervention." [*Id.* at 1, ¶ 2.]

---

[1] The Court recognizes that it must view the facts in the light most favorable to Mr. Oyebade, but Mr. Oyebade must support the facts that he asserts with admissible, record evidence. Fed. R. Civ. P. 56(c)(1)(A). While Mr. Oyebade takes issue with some of the facts Boston Scientific has presented, he has not submitted admissible evidence to counter those facts. Accordingly, the Court considers those facts undisputed. Fed. R. Civ. P. 56(e)(2).

**A. Mr. Oyebade's Employment at Boston Scientific**

On December 22, 2008, Boston Scientific hired Mr. Oyebade to be a Quality Engineer II at its Spencer facility. [*Id.* at 2, ¶ 7.] Prior to his hire, Mr. Oyebade received a December 3, 2008 letter which outlined his offer of employment at Boston Scientific. [Dkt. 140-3 at 8, 10-12.] The letter provided, among other things, that:

- "Boston Scientific is willing to reimburse you for otherwise unreimbursed educational courses in which you are currently enrolled and attending as of your date of hire. To be eligible for this reimbursement, you must complete an Educational Assistance Request and Approval Form and an Agreement to Reimburse on your date of hire or as soon as possible thereafter, not to exceed ten (10) business days from your date of hire. A final eligibility determination will be made based on the information supplied in these forms and otherwise in accordance with the Educational Assistance Program," [*id.* at 11]; and

- "Upon acceptance of this offer and your active start of employment; you will become an 'at will' employee of Boston Scientific. This means that you will be free to resign at any time. Likewise, Boston Scientific will have the right to terminate your employment at any time with or without reason or notice. Acceptance of this offer acknowledges your understanding and acceptance of the 'at will' nature of your employment," [*id.* at 11-12].

**B. The Complaint Lab**

The Complaint Lab at the facility investigates reported malfunctions or problems with medical devices manufactured by Boston Scientific. [Dkt. 140-2 at 1, ¶ 3.] There are two types of complaints the Complaint Lab receives – Medical Device Reports ("MDR"), or Non-Reportable Events. [*Id.* at 2, ¶ 6.] As complaints are received, they are assigned to a Boston Scientific engineer who analyzes the devices to try to determine the cause of the reported problem. [*Id.* at 1, ¶ 4.] The engineer also drafts a report which details the investigation and the engineer's conclusion using Boston Scientific's "TrackWise" software system. [*Id.*]

The Complaint Lab's Quality Assurance Manager and senior engineers then review the investigation report and, if they approve it, forward it to Boston Scientific's Complaint Manage-

ment Center ("CMC") in Massachusetts or Minnesota.  [*Id.* at 2, ¶ 5.]  There, the investigation may be sent back to the original engineer for "re-work" if it is not approved.  [*Id.*]  Reports corresponding with MDR complaint investigations must be filed with the Food and Drug Administration ("FDA") "when information provided to Boston Scientific reasonably suggests that the device may have caused or contributed to a death or serious injury of a patient or that the device had malfunctioned and could cause death or serious injury if the malfunction were to recur."  [*Id.* at 2, ¶ 6.]  Reports corresponding with Non-Reportable Events are not filed with the FDA.  [*Id.*]

As Quality Engineer II, Mr. Oyebade worked in the Complaint Lab under the direct supervision of Brian Szeremeta, who was the Quality Assurance Manager at the time of Mr. Oyebade's hire.  [Dkt. 140-2 at 1-2, ¶¶ 2, 7.]  Mr. Oyebade's colleagues in the Complaint Lab included Eric Shonk and Mark Snelling (both Senior Quality Engineers); Ismail Mohammed (a Quality Engineer II); Lisa Corder, Brenda Hollowell, and Jennifer Roy (all Technicians); and Emily West (a Senior Quality Analyst).  [*Id.* at 2-3, ¶ 8.]  Subsequently, but still during Mr. Oyebade's employment, Mark Snelling transferred to a different position and was replaced by Sam Monk, Ismail Mohammed was promoted to Senior Quality Engineer, and Nkeiru Green and Mohammad Qamar joined the Complaint Lab team – each as a Quality Engineer II.  [*Id.*]

### C. Bereavement Leave

Towards the end of 2009, Mr. Oyebade informed Mr. Szeremeta that his father had passed away in January of 2009 and that, although he was not close with his father, he wanted a four-week leave of absence in December 2009 to travel to Africa and mourn with his family.  [*Id.* at 3, ¶ 11.]  Mr. Szeremeta asked Mr. Oyebade to confirm his request in writing, which he did.  [*Id.*]  Mr. Szeremeta stated that "Mr. Oyebade was unmistakably clear during our conversations [regarding his request for bereavement leave] that he intended to use his four weeks of

leave to travel to Africa for purposes of attending funeral services and/or mourning with his family." [*Id.*][2]

Mr. Szeremeta ultimately granted Mr. Oyebade's request, and he took a four-week leave of absence in December 2009. [*Id.* at 4, ¶ 12.] Mr. Oyebade requested that he be paid for his leave, so he used a combination of three days of bereavement leave and seventeen days of vacation time. [*Id.*] Mr. Oyebade never told Mr. Szeremeta that he would or did use the leave for any purpose other than to go to Africa to mourn his father's death. [*Id.*]

Unbeknownst to Boston Scientific at that time, Mr. Oyebade did not, in fact, travel to Africa to mourn his father's death. [Dkts. 140-4 at 4; 140-5 at 3-4.] Instead, he took his then-fiancée to Chicago so that he could spend time getting to know her. [Dkt. 140-4 at 4.] Mr. Szeremeta would not have granted his request for paid bereavement leave, at least not without further review and consultation with the Human Resources Department, had he known that Mr. Oyebade would not use the time to attend funeral services or otherwise mourn with his family. [Dkt. 140-2 at 4, ¶ 12.]

**D.  Co-Workers' Complaints About Mr. Oyebade's Hygiene**

Shortly after Mr. Oyebade's four-week leave of absence, some of his co-workers in the Complaint Lab complained separately to Mr. Szeremata that Mr. Oyebade had a strong body odor which was making it difficult for them to work closely with or near him in the Complaint Lab. [*Id.* at 4, ¶ 13.] On January 25, 2010, Mr. Szeremata met with Mr. Oyebade in Mr. Szeremata's private office to discuss various work-related issues, including his co-workers' com-

---

[2] Mr. Oyebade does not dispute this statement, and has not pointed to any evidence to contradict it.

plaints regarding his body odor.  [*Id.*]  Mr. Szeremata advised Mr. Oyebade of the complaints, and asked him "to be aware of the concern and attempt to address it."  [*Id.*]

The day after the January 25, 2010 meeting, Mr. Oyebade confronted several of his co-workers and asked them if they thought he had an offensive body odor.  [*Id.* at 5, ¶ 14.]  Those co-workers then complained to Mr. Szeremata that Mr. Oyebade had made them feel uncomfortable, and stated that they believed it was an issue for management to address without their involvement.  [*Id.*]  Mr. Szeremata then told Mr. Oyebade that he should speak to Human Resources regarding any concerns, "rather than making his colleagues feel uncomfortable."  [*Id.* at 5, ¶ 15.]  Mr. Szeremata also consulted Human Resources, which suggested that he speak again to Mr. Oyebade "in an attempt to diffuse the situation."  [*Id.*]  He did so, apologizing to Mr. Oyebade for making him feel uncomfortable and "assur[ing] him that it had never been [his] intent to offend."  [*Id.*]

**E.  Mr. Oyebade's Internal Complaint**

On January 26, 2010, Mr. Oyebade called Boston Scientific's Advice Line and alleged that his supervisor and co-workers in the Complaint Lab were harassing him because of his race and national origin.  [Dkt. 143 at 1-2, ¶ 4.]  Boston Scientific assigned Lynn Prust to investigate Mr. Oyebade's claims, and she called him that same day to set up an interview with him.  [*Id.* at 2, ¶ 5.]  During the initial interview and several follow-up interviews, Mr. Oyebade voiced his concerns regarding:

- The fact that Mr. Szeremata had spoken to him about his body odor;

- His belief that he should have been paid for five days of bereavement leave instead of three;

- His claim that Mr. Szeremata had denied him the opportunity to attend Process Validation Module I training that other Complaint Lab engineers attended;

- His allegation that a co-worker made a comment to him about her grandfather owning slaves;

- His allegation that another co-worker held her nose whenever he walked by; and

- His claim that Boston Scientific failed to reimburse him for tuition for the courses he was enrolled in when he was hired.

[*Id.* at 2, ¶ 6.]

Ms. Prust promptly investigated Mr. Oyebade's claims by, in addition to interviewing him multiple times, also interviewing his co-workers in the Complaint Lab and reviewing documents received by Mr. Oyebade and others.  [*Id.* at 2-3, ¶¶ 7-8.]  Based on her investigation, Ms. Prust concluded that:

- The discussions surrounding Mr. Oyebade's body odor, while uncomfortable for everyone involved, had nothing to do with his race or national origin, [*id.* at 3, ¶ 9];

- Boston Scientific should have awarded Mr. Oyebade five days of bereavement instead of three, but Mr. Oyebade raised his concerns regarding the amount of bereavement he was given for the first time when he called the Advice Line, and had not given Mr. Szeremata a chance to address the issue, [*id.* at 3, ¶ 10]; Boston Scientific promptly credited Mr. Oyebade for two additional bereavement days, [*id.*];[3]

- Mr. Szeremata had waived Process Validation Module 1 training for Mr. Oyebade because he did not believe that Mr. Oyebade, an experienced engineer, needed that particular training, [*id.* at 3, ¶ 11; dkt. 140-2 at 6, ¶ 18]; Mr. Oyebade had already taken Modules 2 and 3 of the training (which were more advanced than Module 1), Mr. Oyebade had signed a waiver for the Module 1 training, Mr. Szeremata also waived the Module 1 training for Mr. Oyebade's Caucasian co-worker, Sam Monk, and the only engineer who took the Module 1 training during Mr. Szeremata's supervision was African American, [dkt. 140-2 at 6, ¶ 18];

---

[3] This occurred before Boston Scientific became aware that Mr. Oyebade had not, in fact, travelled to Africa during his four-week leave – which it only learned during the course of this litigation.

- The co-worker that Mr. Oyebade alleged told him that her grandfather owned slaves adamantly denied that she had made that remark, and the co-worker that Mr. Oyebade alleged covered her nose when he walked by adamantly denied doing so, [dkt. 143 at 3-4, ¶ 12];

- Mr. Oyebade submitted his request for tuition reimbursement one day after the deadline (when counting the date of hire as part of the ten-day deadline), but Ms. Prust received permission to make an exception and reimburse Mr. Oyebade for the requested tuition amounts, [*id.* at 4, ¶ 13]; he received reimbursement in April 2010, [*id.*].

### F.  The February 1, 2010 EEOC Charge

On February 1, 2010, after returning from his four-week leave, Mr. Oyebade filed a charge with the Equal Employment Opportunity Commission ("<u>EEOC</u>"),[4] complaining, among other things, that Boston Scientific should have paid him for five days of bereavement under its bereavement leave policy instead of three.  [Dkt. 1-2 at 2.][5]

### G.  The American Express Corporate Card

Boston Scientific issued American Express corporate credit cards to certain employees – including the salaried employees working in the Complaint Lab – subject to Boston Scientific's Global Travel & Entertainment Policy.  [Dkts. 140-1 at 2, ¶ 3; 140-2 at 3, ¶ 9.]  According to the Global Travel & Entertainment Policy, "[t]he corporate American Express card can only be used for business related travel and entertainment expenses.  It is a violation of Boston Scientific policy to use the card for any other charges and can result in [Boston Scientific] taking corrective action."  [Dkt. 140-1 at 7.]

---

[4] While Mr. Oyebade did not attach the EEOC charge to the Amended Complaint, he referred to it as being filed with his original Complaint.  [Dkt. 57 at 2, ¶ 6.]

[5] The EEOC responded to the charge that it was "unable to conclude that the information obtained establishes violations of the statutes.  This does not certify that the respondent is in compliance with the statutes.  No finding is made as to any other issues that might be construed as having been raised by this charge."  [*Id.* at 3.]

On February 12, 2010, after Mr. Oyebade had lodged his internal complaint and Ms. Prust had begun investigating it, Mr. Szeremata received an automated e-mail message stating that Mr. Oyebade had charges on his corporate card that were approaching 60 days past due. [Dkt. 140-2 at 7, ¶ 19.] Mr. Szeremata was surprised to receive that e-mail because in April 2009 Mr. Oyebade had told him that he had accidentally charged some personal items on his corporate card and wanted to know what to do. [*Id.* at 3, 7, ¶¶ 10, 19.] During that conversation, Mr. Szeremata had "explicitly told Mr. Oyebade that he needed to be sure he did not use the card for personal charges again," and "Mr. Oyebade assured [him] that he understood the policy and acknowledged that charging personal items had been a mistake." [*Id.* at 3, ¶ 10.] After receiving the February 12, 2010 e-mail, Mr. Szeremata contacted Boston Scientific's Employee Reimbursement Shared Services group and learned that Mr. Oyebade had charged $14,237.45 in non-expensed items since receiving his corporate card in January 2009. [*Id.* at 7, ¶ 19.] Seeing no legitimate basis for the charges, Mr. Szeremata notified Human Resources. [*Id.*; dkt. 143 at 4, ¶ 14.]

On March 2, 2010, Ms. Prust interviewed Mr. Oyebade regarding the charges on the corporate card. [Dkt. 143 at 4, ¶ 14.] He acknowledged his April 2009 conversation with Mr. Szeremata, and that Mr. Szeremata told him at that time to use the card only for business expenses and to inform Mr. Szeremata when he used the card. [*Id.*] He claimed, however, that Accounts Payable told him that he simply needed to pay charges within 60 days, and did not say anything about using the card only for business expenses. [*Id.*] Mr. Oyebade admitted, however, that he knew and understood Boston Scientific's Global Travel & Entertainment Policy, but that he had been using the corporate card for "regular personal usage." [*Id.*]

As a result of Mr. Oyebade's repeated use of the corporate card for personal expenses in violation of Boston Scientific policy, Boston Scientific issued Mr. Oyebade a Verbal Corrective Action, which is Boston Scientific's least severe form of discipline.  [*Id.* at 5, ¶ 16; dkts. 140-1 at 2, ¶ 5 and 8-10; 140-7 at 1-2, ¶ 3.]  The day after receiving the Verbal Corrective Action, Mr. Oyebade contacted Ms. Prust and stated that he believed the discipline was in retaliation for his previous complaints of discrimination and harassment. [Dkt. 143 at 5, ¶ 17.]  Ms. Prust met with Mr. Oyebade to discuss his concerns, informed him that she had confirmed the Verbal Corrective Action was the proper consequence of his violation of Boston Scientific's policy, and "corrected his mistaken belief that his Verbal Corrective Action prevented him from receiving a promotion…."  [*Id.*]

**H.  The April 6, 2010 EEOC Charge**

On April 6, 2010, Mr. Oyebade filed a charge with the EEOC in which he alleged that Boston Scientific was discriminating against him in violation of Title VII because he was issued "disciplinary action" because of his race and his national origin, and because he had previously filed a charge with the EEOC.  [Dkt. 1-3 at 2.]  He stated "[t]he disciplinary action, which was based on something that happened in 2009, prevents me from being promoted.  I had filed a racial harassment complaint previously with EEOC and I never had any issues prior until now.  I applied for a Sr. Engineer position on April 5, 2010; the next day I was issued a warning that prevents me from being considered for promotion per company policy."  [*Id.*]  The EEOC responded that it was "unable to conclude that the information obtained establishes violations of the statutes.  This does not certify that the respondent is in compliance with the statutes…."  [*Id.* at 3.]

### I.  Mr. Oyebade's Termination

The Complaint Lab procedures require engineers to attach a copy of a picture of the de-vice they are investigating to their report.  [Dkt. 140-7 at 2, ¶ 5 and 9-17.]  On April 14, 2010, as part of his routine review of the complaint investigation reports completed by his engineers, Mr. Szeremata noticed that the photograph attached to a report completed by Mr. Oyebade looked identical to the photograph attached to a different report Mr. Oyebade had completed regarding a different device.  [Dkt. 140-2 at 7-8, ¶ 21.]  Upon further investigation, Mr. Szeremata deter-mined that Mr. Oyebade had used the same photograph for investigation reports for three differ-ent devices and had explicitly cited the photograph to support his conclusions in the reports. [*Id.*]  In all, there were thirteen investigation reports created by Mr. Oyebade where he had at-tached the same photograph to two or more reports, including several MDR complaints that were required to be reported to the FDA.  [*Id.* at 8, ¶ 22.]  Significantly, Mr. Szeremata reviewed the electronic file name for each of the photographs and learned that Mr. Oyebade had changed the file name each time he had used the same photographs, creating the impression that the photo-graphs were unique and specific to the investigation reports to which they were attached.  [*Id.*]

On April 19, 2010, Natalie Hardin (a Boston Scientific Human Resources representative) and Jennifer Walls-Reynolds (Mr. Szeremata's supervisor) met with Mr. Oyebade to discuss his complaint investigations.  [dkt. 140-1 at 2-3, ¶ 6.]  Mr. Oyebade acted erratically, stating that he was going to record the conversation (even though it would be in violation of Boston Scientific policy to do so), and that he always wore a recording device.  [*Id.*]  He then became emotional and began to yell at Ms. Hardin, accusing her of discriminating against him, harassing him, hu-miliating him, and treating him "like a slave."  [*Id.* at 3-4, ¶ 7.]  When Ms. Hardin attempted to review Boston Scientific policies with him, Mr. Oyebade put his fingers in his ears.  [*Id.*]  When

it became clear that he was not listening and would not calm down, Ms. Hardin informed him that he was immediately suspended pending the outcome of the investigation. [*Id.*] She instructed him not to perform any work during his suspension, and that company property must stay on site. [*Id.*] Mr. Oyebade asked if he could get some personal photographs off of his company laptop computer at his desk, and Ms. Hardin told him he could not, that he could not return to his desk, but that she would arrange for the photographs to be returned to him. [*Id.*] Mr. Oyebade threatened to call the police, and Ms. Hardin reiterated that he was not to return to the work area. [*Id.*]

Ms. Hardin asked a security guard to make sure that Mr. Oyebade left the building, [*id.* at 4, ¶ 8], but the security guard and Ms. Walls-Reynolds found Mr. Oyebade at his computer "manipulating (e.g., rapidly opening and closing) files," [dkt. 140-7 at 4, ¶ 11]. Ms. Walls-Reynolds instructed Mr. Oyebade to leave and he did not respond, instead asking if he had left his papers in Ms. Hardin's office. [*Id.*] When Ms. Walls-Reynolds said she would retrieve the papers for him, he grabbed some personal items, bent down to pick something up and, when he stood, bumped into Ms. Walls-Reynolds in what appeared to be a deliberate fashion. [*Id.*] Mr. Oyebade eventually left, and returned the next day with a police officer to return certain property. [*Id.*; dkt. 140-1 at 4, ¶ 9.]

Ms. Hardin then attempted to contact Mr. Oyebade by telephone twice, eventually sending him an e-mail to notify him that a Boston Scientific representative would interview him on April 29, 2010 at an offsite locate. [Dkt. 140-1 at 4, ¶ 10.] Mr. Oyebade did not appear for the meeting, instead sending an email to a broad audience at Boston Scientific recounting his prior complaints. [*Id.* at 4, ¶ 10.] On April 27, 2010, Ms. Hardin e-mailed Mr. Oyebade asking him to confirm that he would attend an interview scheduled for May 4 and stating that, if he failed to

attend, Boston Scientific would take that into account in its analysis and his employment could be terminated. [*Id.* at 4-5, ¶ 11.] Mr. Oyebade did not respond to the e-mail, nor did he attend the May 4 meeting. [*Id.*] As a result, Boston Scientific terminated Mr. Oyebade's employment for failing to cooperate in the investigation and for apparent violations of the complaint investigation procedures. [*Id.*] Upon his termination, and in accordance with its standard practice, Boston Scientific paid Mr. Oyebade for his earned, unused vacation time. [*Id.* at 5, ¶ 12.]

### J.   The Post-Termination EEOC Charge and the Lawsuit

On July 7, 2010, after his termination from Boston Scientific, Mr. Oyebade filed a third charge with the EEOC in which he claimed that he was terminated in violation of Title VII out of retaliation for complaining of racial harassment and for filing his prior charges with the EEOC. [Dkt. 1-1 at 2.] The EEOC concluded that it was "unable to conclude that the information obtained establishes violations of the statutes. This does not certify that the respondent is in compliance with the statutes." [*Id.* at 3.]

Mr. Oyebade filed his Complaint in this matter on July 20, 2011, [dkt. 1], and the operative Amended Complaint on April 9, 2012, [dkt. 57]. He asserts the following claims against Boston Scientific: (1) race discrimination under Title VII, [*id.* at 19-21, ¶¶ 93-99]; (2) discrimination based on national origin under Title VII, [*id.* at 20-21, ¶ ¶ 100-105]; (3) unlawful retaliation under Title VII, [*id.* at 21-23, ¶¶ 106-110]; (4) intentional infliction of emotional distress, [*id.* at 23-25, ¶¶ 111-118]; (5) negligent infliction of emotional distress, [*id.* at 25-28, ¶¶ 119-129]; (6) promissory estoppel, [*id.* at 28-29, ¶¶ 130-136]; (7) wrongful termination, [*id.* at 29-31, ¶ ¶ 137-142]; and (8) breach of contract, [*id.* at 31-32, ¶¶ 143-147]. Boston Scientific now

moves for summary judgment on all of Mr. Oyebade's claims,[6] and also on its counterclaims against Mr. Oyebade for fraud, constructive fraud, and abuse of process.

### IV.
### DISCUSSION

#### A.  Surreply

At the outset, the Court notes that Mr. Oyebade has filed a Motion to Supplement Response/Answers to Defendant's Motion for Summary Judgment, [dkt. 153], arguing that he did not have enough time to fully address the issues raised in the Motion for Summary Judgment in his original response.  His Motion to Supplement Response/Answers to Defendant's Motion for Summary Judgment – which attached a twenty-six page "supplemental response" – was filed twenty days after Boston Scientific filed its reply in support of the Motion for Summary Judgment.  [*Id.*]

After reviewing the "supplemental response," the Court finds that it is actually a surreply governed by Local Rule 56-1(d), which provides that "[a] party opposing a summary judgment motion may file a surreply brief only if the movant cites new evidence in the reply or objects to the admissibility of the evidence cited in the response[; t]he surreply must be filed within 7 days after the movant serves the reply and must be limited to the new evidence and objections."  Mr. Oyebade's "supplemental response" does not discuss any "new evidence" raised by Boston Scientific in its reply.  Additionally, to the extent Boston Scientific's reply objected to the admissibility of any evidence Mr. Oyebade cited in his response, Mr. Oyebade did not directly address admissibility issues in his surreply, so the surreply was not filed for the purpose of addressing those issues.  Finally, the "supplemental response" was filed well after the seven-day deadline set

---

[6] Boston Scientific provided Mr. Oyebade, as a *pro se* litigant,  with the requisite notice of its Motion for Summary Judgment pursuant to Local Rule 56-1(k).  [Dkt. 142.]

forth in Local Rule 56-1.  Accordingly, the Court finds that Mr. Oyebade is simply either seeking a do-over or trying to get the last word.  The Court denies Mr. Oyebade's Motion to Supplement Response/Answers to Defendant's Motion for Summary Judgment, [dkt. 153], and will not consider the arguments made therein.[7]

### B.  Title VII Discrimination Claims

To overcome a Title VII discrimination claim on summary judgment, Mr. Oyebade may either provide direct evidence of discrimination, *Rhodes v. Ill. Dep't of Transp.*, 359 F.3d 498, 504 (7th Cir. 2004), or show indirect evidence under the burden-shifting analysis of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).

To survive summary judgment, Mr. Oyebade must first establish a prima facie case of discrimination.  *Id.* at 802.  Specifically, he must show that: (1) he was a member of a protected class; (2) he adequately performed his employment responsibilities; (3) despite adequate performance, he suffered an adverse employment action; and (4) he received different treatment than similarly situated persons who were not members of the same protected class.  *See Boumehdi v. Plastag Holdings, LLC*, 489 F.3d 781, 790 (7th Cir. 2007) (citation omitted).  If Mr. Oyebade can make that showing, the burden shifts to Boston Scientific to come forth with a "legitimate, non-discriminatory reason" for its actions.  *Hill v. Potter*, 625 F.3d 998, 1001 (7th Cir. 2010) (citation omitted).  If Boston Scientific can do so, it will prevail unless Mr. Oyebade can come forward with admissible evidence that the proferred non-discriminatory reason is "a pretext for intentional discrimination."  *Serednyj v. Beverly Healthcare, LLC*, 656 F.3d 540, 551 (7th Cir. 2011) (citation omitted).

---

[7] In any event, the Court notes that many of the arguments Mr. Oyebade discusses in his "supplemental response" were already asserted in his initial response.

Mr. Oyebade bases his race and national origin discrimination claims on his allegations that he was denied proper bereavement leave, Module 1 training, and promotions, that his co-workers referred to him as a slave, falsely accused him of having offensive body odor, and covered their noses when he arrived for work, and that he was wrongfully disciplined in connection with his use of the American Express corporate credit card.  [Dkt. 57 at 14, ¶¶ 68-69 and 19-21, ¶¶ 93-105.]  The Court will address each of Mr. Oyebade's discrimination claims in turn.

### 1. Bereavement Leave

Mr. Oyebade's first theory for his Title VII claims is that Boston Scientific paid him for three days of bereavement instead of five during his bereavement leave at the end of 2009 because of his race (African American) and his national origin (African).  [*See* dkt. 57 at 20, ¶ 95.] Boston Scientific argues that Mr. Oyebade was never entitled to bereavement leave, so cannot base his claim on receiving pay for three days bereavement instead of five.  [Dkt. 141 at 19-20.] It also argues that, in any event, Mr. Oyebade cannot establish that Boston Scientific's decision to pay him for three days of bereavement instead of five was somehow motivated by discrimination.  [*Id.* at 20.]  Mr. Oyebade responds that Boston Scientific's payment of three bereavement days instead of five was intentional and not an oversight, that it was reflected on a timesheet printed shortly after he filed his February 2010 EEOC claim, and that he never informed Boston Scientific how and where he would spend his bereavement leave, nor did Boston Scientific's bereavement policy require that he do so.  [Dkt. 146 at 4-5.]

There is no dispute that Mr. Oyebade is a member of a protected class.  The fundamental problem with his Title VII claims based on Boston Scientific's payment to him for three days of bereavement instead of five, however – and, indeed with any claims based on the bereavement pay – is that Mr. Oyebade did not in fact take bereavement leave.  Boston Scientific's bereave-

ment policy provides that it is "[t]o assist employees experiencing a loss in the family," and "[t]o recognize respectfully the importance of employees' family lives and their grieving process." [Dkt. 146-4 at 3.]  Mr. Oyebade argues that the policy is "vague," [dkt. 146 at 5], but fails to present any evidence that he spent any of his four-week leave grieving his father's death – which had occurred nearly a year before.  He also does not dispute evidence presented by Boston Scientific that he used his four-week leave to get to know his fiancée better.  [Dkts. 140-4 at 4; 140-5 at 3-4.]  This fact is fatal to his Title VII claims based on that theory.  Boston Scientific cannot have discriminated against him for paying him less bereavement leave than what he was entitled to, when he in fact was not entitled to *any* bereavement leave.

Additionally, even if Mr. Oyebade had taken the bereavement leave, nowhere does he argue that Boston Scientific's decision to pay him for three days instead of five was motivated by his race or national origin and, indeed, there is no evidence whatsoever of that – either direct or indirect.  To the extent that Mr. Oyebade bases his bereavement-related Title VII claim on his argument that the timesheet reflecting payment for three days instead of five was printed on Boston Scientific's timesheet management system nine days after he filed his February 1, 2010 EEOC charge, [dkt. 146 at 4-5], his claim still fails.  The EEOC charge related, in part, to Boston Scientific's decision to pay him for three days bereavement instead of five, [dkt. 1-2 at 2 ("I was only paid three of the five days allowed per policy [for bereavement]")].  Boston Scientific could not have retaliated against Mr. Oyebade for filing the EEOC charge by paying him for only three days, when the allegedly deficient payment formed a basis of, and thus predated, the charge.  Mr. Oyebade's Title VII claims fail as a matter of law to the extent they are based on Boston Scientific's decision to pay him for only three days bereavement instead of five.

2.  *Module 1 Training*

Boston Scientific argues that Mr. Oyebade's Title VII claims based on his denial of Module 1 training fail at the start because he cannot identify a similarly situated Caucasian individual who was treated more fairly than he was, that the evidence actually shows that Mr. Szeremata waived the training for a Caucasian co-worker and did not waive it for an African American co-worker, and that this waiver of training was not a materially adverse employment action.  [Dkt. 141 at 20.]  Mr. Oyebade responds that Boston Scientific's proferred reason for denying the training (that an FDA audit was going on at the time, so Mr. Szeremata wanted Mr. Oyebade focusing on the audit rather than attending training) was false, that the Caucasian employee denied the training was never a Complaint Lab employee, and that all engineers in the Complaint Lab with the same title as Mr. Oyebade participated in the training.  [Dkt. 146 at 9.]

The fatal flaw with Mr. Oyebade's denied training theory is that he has not established that waiving the training was an adverse employment action and, in fact, it was not.  *See, e.g., Johnson v. Siemens Bldg. Techs., Inc.*, 273 Fed. Appx. 543, 547 (7th Cir. 2008) (failure to provide employee with training was not adverse employment action); *Washington v. Am. Drug Stores, Inc.*, 119 Fed. Appx. 3, 4 (7th Cir. 2004) (failing to inform employee of training sessions, and not having her attend, did not constitute adverse employment action).  Additionally, even if waiving the training could somehow be construed as an adverse action, Mr. Oyebade has not disputed the fact that Mr. Szeremata also waived the training for a Caucasian co-worker, and required it for an African American co-worker.  And, if that were not enough, Mr. Szeremata's reasons for having Mr. Oyebade skip the Module 1 training -- that he did not need that particular training given his role within the company, that he had already taken the more advanced second and third modules so there was no reason for him to take the first module, and that Mr.

Oyebade's time was better spent preparing for an upcoming FDA inspection – are legitimate and Mr. Oyebade has presented no evidence to show they were pretextual.  His "denial" of Module 1 training cannot support his Title VII claims.

### 3. *Promotion Denial*

Boston Scientific asserts that Mr. Oyebade has not specified what promotion he applied for and was denied, despite the fact that it is his burden to do so, and that in any event, he has not demonstrated that he was treated differently than any similarly situated comparators.  [Dkt. 141 at 21.]  Mr. Oyebade responds that "similarly situated employees were constantly promoted within months or a year on the job," names three individuals who were promoted, and states that he applied for a Senior Quality Engineer position on April 5, 2010 and did not receive the promotion but instead was "put on disciplinary action" the next day.  [Dkt. 146 at 10.]

Mr. Oyebade has not presented any direct evidence of discrimination.  Under the indirect method, his Title VII claims based on denial of a promotion fail first and foremost because he has not identified any similarly situated employees who were promoted and were not members of the same protected classes that he was.  *Boumehdi*, 489 F.3d at 790.  He has simply provided three names of individuals who received promotions around the time that he alleges he applied for a promotion, but does not provide any detail whatsoever regarding their background, their race, their national origin, or how they are similar to him.  It is Mr. Oyebade's burden to provide such detail, and his failure to do so means he has failed to introduce admissible evidence to establish a prima facie case on his Title VII claims based on failure to promote.

### 4. *Boston Scientific's Handling of Hygiene Complaints*

Boston Scientific argues that Mr. Oyebade cannot show that he was somehow discriminated against through its handling of Mr. Oyebade's co-workers' complaints about his body

odor.  [Dkt. 141 at 21-22.]  Specifically, it argues that being told his co-workers complained was not a materially adverse employment action and would not dissuade a reasonable employee – and did not dissuade Mr. Oyebade – from making a claim of discrimination, and that there is no evidence to suggest that Mr. Oyebade's co-workers' complaints were motivated by discrimination. [*Id.*]  Mr. Oyebade's only response is that he does not, in fact, have an offensive body odor. [Dkt. 146 at 12-13.]

The complaints regarding Mr. Oyebade's body odor – whether or not it was offensive – no doubt created a sensitive situation.  Mr. Szeremata attempted to discuss the issue with Mr. Oyebade, who was offended and then asked his co-workers whether they had lodged complaints, which made them feel uncomfortable.  [Dkt. 140-2 at 4-5, ¶¶ 13-14.]  Mr. Oyebade argues that because he did not, in fact, have an offensive body odor, confronting him about it was discriminatory.  But Mr. Oyebade does not allege that he suffered any materially adverse employment action based on this alleged discrimination, and simply being confronted about the issue by Mr. Szeremata does not constitute such an action.[8]

Further, Mr. Oyebade has not pointed to any admissible evidence that Mr. Szeremata confronted him for any reason other than to attempt to handle Mr. Oyebade's co-workers' complaints.  Whether Mr. Oyebade actually had offensive body odor is not the issue; the evidence of record establishes his co-workers had complained that he did, and Mr. Szeremata was simply trying to resolve the situation.  Mr. Oyebade's opinion that the complaints or their handling were discriminatory is not admissible evidence, and the Court finds no evidence that Mr. Szeremata's meeting with Mr. Oyebade to discuss the complaints had anything to do with Mr. Oyebade's race

---

[8] To the extent Mr. Oyebade claims that complaints about his body odor created a hostile work environment, that argument is addressed below.

or national origin.  Boston Scientific's handling of the complaints is not a valid basis for Mr. Oyebade's Title VII claims.

### 5.  Initial Decision to Deny Tuition Reimbursement

Boston Scientific argues that it denied Mr. Oyebade's request for tuition reimbursement based on a third-party processor's decision that the request was untimely and that, after investigating and determining that the request was only one day late, it determined to reimburse Mr. Oyebade and in fact promptly did so.  [Dkt. 149 at 9-10.]  It also notes that the initial decision to deny reimbursement was made by a third-party processor, and there is no evidence that the processor even knew Mr. Oyebade's race or national origin.  [*Id.* at 9.]  Mr. Oyebade argues that he submitted his request in a timely fashion.  [Dkt. 146 at 8.]

Again, Mr. Oyebade does not attempt to show – either directly or indirectly – that Boston Scientific's initial failure to reimburse him for tuition had anything whatsoever to do with his race or national origin.  His only argument is that his request was not late.  Moreover, Mr. Oyebade has not even attempted to show that Boston Scientific's initial denial of the reimbursement request was an adverse employment action or that other similarly situated employees outside of Mr. Oyebade's protected class were reimbursed under the same circumstances.  And, he was in fact reimbursed.  His Title VII discrimination claims based on the tuition reimbursement theory fail.

### 6.  American Express Corporate Credit Card

Mr. Oyebade appears to allege that Boston Scientific discriminated against him by disciplining him for using his American Express corporate credit card for personal charges when he "used the card like everybody else within the company that were never reprimanded and he paid the bills for personal related charges without submitting expense reports for Boston Scientific

account receivable to pay which would have constituted a violation of the so called vague and ambiguous policy." [Dkt. 146 at 3.] Boston Scientific argues that Mr. Oyebade has not shown any disparate treatment, nor that he suffered an adverse employment action. [Dkt. 149 at 5.]

Boston Scientific's handling of Mr. Oyebade's improper corporate credit card usage cannot support a discrimination claim. First, he has not shown that he suffered an adverse employment action – and receiving a verbal warning does not constitute such an action. *See Baynham v. Meridian Servs. Corp.*, 2012 U.S. Dist. LEXIS 117916, *36 (S.D. Ind. 2012) (verbal warning did not constitute adverse employment action where it did not result in a tangible job consequence). Second, Mr. Oyebade does not identify any individuals outside of his protected class who used their corporate credit card for personal charges and did not receive a verbal warning. Simply stating that others used the card in the same manner as he did and were not disciplined, [dkt. 146 at 3-4], is not enough. The credit card discipline cannot support a Title VII claim.

### 7. *Conclusion as to Title VII Discrimination Claims.*

Mr. Oyebade's Title VII discrimination claims fail as a matter of law because: (1) being paid for three days of bereavement instead of five, when Mr. Oyebade was in fact entitled to zero days of bereavement, cannot support a discrimination claim; (2) Mr. Oyebade has not established that Mr. Szeremata's waiver of Module 1 training for him was an adverse employment action or that similarly situated employees were treated differently, and Mr. Szeremata's reasons for waiving the training were legitimate; (3) Mr. Oyebade has not sufficiently identified a comparator in connection with his promotion denial claim; (4) there is no evidence of discrimination regarding Boston Scientific's handling of Mr. Oyebade's co-workers' complaints about his hygiene, nor did that handling constitute a materially adverse employment action; (5) Mr. Oyebade has not shown that Boston Scientific's initial denial of his tuition reimbursement request was an adverse

employment action, or that Boston Scientific treated similarly situated employees more favorably; and (6) Mr. Oyebade has not demonstrated that receiving a verbal warning regarding his use of the corporate credit card was an adverse employment action, or that similarly situated employees were treated differently.  Boston Scientific is entitled to summary judgment on each of the foregoing claims.

### C.  Retaliation and Wrongful Termination Claims

Mr. Oyebade alleges that he "voiced opposition to Defendant's illegal practices and conducts which he reasonably believed to be discriminatory on the basis of his race and national origin, therefore in retaliation, Defendant wrongfully terminated [his] employment."  [Dkt. 57 at 21-22, ¶ 106; *see also id.* at 30-31, ¶¶ 140-141.]  Boston Scientific argues that there is no evidence which undercuts Boston Scientific's reasons for terminating Mr. Oyebade's employment, which had nothing to do with his protected conduct.  [Dkt. 141 at 22-23.]  Mr. Oyebade responds that he never had any issues at work until he filed his first EEOC charge on February 2, 2010.  [Dkt. 146 at 10-11.]  He also argues that Boston Scientific's claim that he falsified photographs attached to complaint investigations – which he contends is the reason he was terminated – is a pretext for discrimination because he was "only doing his job as [he was] supposed to."  [*Id.* at 20-21.]

Under Title VII, it is "an unlawful employment practice for an employer to discriminate against any of his employees…because he has…made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this title."  42 U.S.C. § 2000e-3(a).  Under the direct method of proof, Mr. Oyebade must demonstrate that "(1) he engaged in a statutorily protected activity; (2) he suffered a materially adverse action by his employer; and (3) a causal connection exists between the two."  *Stephens v. Erickson*, 569 F.3d 779, 786 (7th Cir.

2009).  Boston Scientific does not dispute that filing an EEOC charge constitutes protected activity, or that Mr. Oyebade's termination was a materially adverse action.  It contends, however, that the termination was unrelated to the filing of the EEOC charges.  Mr. Oyebade appears to argue that he had not been disciplined or had any issues before he filed his first EEOC charge, but timing alone cannot be the sole evidence of retaliation.  *Wyninger v. New Venture Gear, Inc*., 361 F.3d 965, 981 (7th Cir. 2004) ("'mere temporal proximity' is not enough to establish a genuine issue of material fact"); *Scaife v. Cook County*, 446 F.3d 735, 742 (7th Cir. 2006) ("[c]lose temporal proximity provides evidence of causation and may permit a plaintiff to survive summary judgment provided that there is other evidence that supports the inference of a causal link") (*quoting Lang v. Ill. Dep't of Children & Family Servs.*, 361 F.3d 416, 419 (7th Cir. 2003)).

Under the indirect method of proof, even assuming Mr. Oyebade could make a prima facie case, he must present evidence that Boston Scientific's preferred reason for his termination – his failure to cooperate with the investigation into his alleged use of the same photograph to support several complaint investigations – is an actual "lie," not a mere "mistake."  *Russell v. Acme-Evans Co.*, 51 F.3d 64, 68 (7th Cir. 1995).  Here, Mr. Oyebade makes no attempt to show that he did, in fact, cooperate in the investigation or that he did not act erratically.  He does not address his behavior after being confronted about the photo attachments to the investigation complaints at all, instead simply stating that whether or not he attached the correct photograph is irrelevant and not a good enough reason for being terminated.  [Dkt. 146 at 13-17.]  But Mr. Oyebade was terminated for his actions relating to the investigation of the photo issue, not the photo issue itself.  He has offered no admissible evidence to show that his termination was motivated by his EEOC charges, so his Title VII retaliation and wrongful termination claims fail as a matter of law.

### D. Hostile Work Environment Claim

Mr. Oyebade alleges that he was subject to a hostile work environment because his co-workers allegedly covered their noses whenever he walked by, joked about his accent and pointed at him while they were laughing, one co-worker threatened him with guns, and his co-workers referred to him as a slave.  [Dkt. 57 at 12, ¶¶ 57-58, 20, ¶¶ 96-97.]  Boston Scientific argues that there is no evidence Mr. Oyebade's co-workers' complaints regarding his body odor had anything to do with his race or national origin so cannot form a basis for a hostile work environment claim; his allegations regarding being referred to as a slave are too vague to defeat summary judgment and have inexplicably expanded as the case has progressed; and he never reported the alleged slave comments during his employment.  [Dkt. 141 at 25-26.]  Mr. Oyebade responds that he was constantly harassed by his co-workers, that he reported the gun threats but Boston Scientific never investigated them, and that he cried on a number of occasions and "literally begged for his life and asked his managers to stop the harassment but the managers refused and instead pretended as if an ongoing internal investigation will address[] his concerns…."  [Dkt. 146 at 7-8.]

To survive summary judgment on a hostile work environment claim against an employer, the employee must show: "(1) he was subject to unwelcome harassment; (2) the harassment was based on his race; (3) the harassment was severe or pervasive so as to alter the conditions of the employee's work environment by creating a hostile or abusive situation; and (4) there is a basis for employer liability."  *Smith v. Northeastern Ill. Univ.*, 388 F.3d 559, 566 (7th Cir. 2004).  The employee must also show either that a supervisor participated in the harassment that created the hostile work environment, or that the employer was negligent in discovering or remedying it.  *Andonissamy v. Hewlett-Packard Co.*, 547 F.3d 841, 848 (7th Cir. 2008).  In evaluating the se-

verity and pervasiveness of the conduct, we examine "all the circumstances, including 'the fre-

quency of the discriminatory conduct; its severity; whether it is physically threatening or humili-

ating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's

work performance.'" *Russell v. Bd. of Trs.*, 243 F.3d 336, 343 (7th Cir. 2001) (*quoting Smith v.*

*Sheahan*, 189 F.3d 529, 533-34 (7th Cir. 1999)).  To satisfy the "severe or pervasive" element,

the employee must show that the work environment was both subjectively and objectively offen-

sive, such that "a reasonable person would find hostile or abusive, and one that the victim in fact

did perceive to be so."  *Cerros v. Steel Technologies, Inc.*, 288 F.3d 1040, 1045 (7th Cir. 2002).

The workplace that is actionable is one that is "hellish."  *Wyninger*, 361 F.3d at 977.

     Title VII "does not guarantee a happy workplace."  *Cerros*, 288 F.3d at 1047.  Mr.

Oyebade's hostile work environment claim centers on his allegations that his co-workers "persis-

tently" called him names related to his body odor (*e.g.*, dead rat, garbage), Mr. Szeremata con-

fronted him about his body odor, one of his co-workers threatened him with a gun, and his co-

workers called him a slave.  [Dkt. 146 at 5-8.]  This evidence – even when viewed in the light

most favorable to Mr. Oyebade – is not adequate to support a hostile work environment claim.

First, Mr. Oyebade has not presented any evidence that the co-workers' actions with respect to

calling Mr. Oyebade names relating to his body odor or plugging their noses were motivated by

anything other than what they perceived to be offensive body odor – and not by his race or na-

tional origin.  The same holds true for Mr. Szeremata's conversation with Mr. Oyebade about the

co-workers' complaints.

     Second, even if a co-worker threatened Mr. Oyebade with a gun – which is only support-

ed by Mr. Oyebade's vague allegations – there again is no evidence that the threat had anything

to do with Mr. Oyebade's race.  And Mr. Oyebade also has not presented any admissible evi-

dence that he reported the gun threat to a supervisor, as he must in order to sustain a hostile work environment claim. *See Montgomery v. Am. Airlines*, 626 F.3d 382, 391-92 (7th Cir. 2010) (hostile work environment claim failed where employee did not report alleged harassment to supervisors so that they could intervene).

Finally, Mr. Oyebade's allegations regarding his co-workers calling him a slave are also vague and problematic. The Court notes that Mr. Oyebade initially claimed in his February 1, 2010 EEOC charge that only one co-worker told him her grandfather had owned slaves. [Dkt. 1-2 at 2.] As the case has progressed, he now alleges that numerous co-workers pervasively called him a slave. [*See, e.g.*, dkt. 146 at 20.] Even assuming his latest allegations are true, however, they are too vague to support a claim of hostile work environment. Mr. Oyebade must demonstrate that the comments were severe and pervasive by presenting evidence of the frequency of such comments. *Ellis v. CCA of Tenn. LLC*, 650 F.3d 640, 647 (7th Cir. 2011) (plaintiff must present evidence that conduct at issue was severe and pervasive enough to cause psychological injury); *McKenzie v. Illinois DOT*, 92 F.3d 473, 480 (7th Cir. 1996) ("isolated and innocuous incidents will not support a hostile environment claim"). For Mr. Oyebade to simply say that he was called a slave "left and right" and "persistently," [dkt. 146 at 7], is not enough. As important, Mr. Oyebade has presented no admissible evidence that he reported the "pervasive" com-

- 28 -

ments to a supervisor, which is again fatal to his claim.  *See Montgomery*, 626 F.3d at 391-92. For these reasons, his hostile work environment claim fails as a matter of law.[9]

### E.  State Law Tort and Common Law Claims

The Court has resolved the sole federal question asserted in this action and, consequently, is left with various state law claims over which it lacks diversity jurisdiction.  Therefore, the Court must determine whether to exercise its discretion to retain jurisdiction over the supplemental claims pursuant to 28 U.S.C. § 1367(a) or to dismiss them pursuant to 28 U.S.C. § 1367(c).

If a case was originally filed in federal court and the Court determines that it will not exercise supplemental jurisdiction over the remaining state law claims, the proper course is to dismiss those claims without prejudice, not remand them to state court.  *Harvey v. Town of Merrillville*, 2011 U.S. App. LEXIS 14165 (7th Cir. 2011).  The district court ultimately has discretion whether to exercise supplemental jurisdiction over a plaintiff's state law claims.  *Carlsbad Tech., Inc. v. HIF BIO, Inc.*, 129 S. Ct. 1862, 1866 (2009); 28 U.S.C. § 1367(c) ("The district courts may decline to exercise supplemental jurisdiction over a claim…if…the district court has dismissed all claims over which it has original jurisdiction….").  When deciding whether to exercise supplemental jurisdiction, "'a federal court should consider and weigh in each case, and at every stage of the litigation, the values of judicial economy, convenience, fairness, and comity.'" *City of Chicago v. Int'l Coll. of Surgeons*, 522 U.S. 156, 173, (1997) (quoting *Carnegie-Mellon*

---

[9] Mr. Oyebade submits certain evidence which he claims supports his hostile work environment claim, but this evidence is either inadmissible, [*see, e.g.*, dkts. 146-24 at 15-17 (excerpts from Mr. Oyebade's wife's deposition wherein she testified regarding what he told her regarding co-workers calling him a slave, which is inadmissible hearsay); 146-16 (unauthenticated audio recording)], or Mr. Oyebade does not explain its relevance, [*see, e.g.*, dkt. 146-26 (what appear to be unauthenticated copies of text messages provided to Ms. Prust which contain offensive racial and sexual jokes, but which significantly pre-date Mr. Oyebade's employment with Boston Scientific and do not refer or relate to Mr. Oyebade in any way)].

*Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988)). It is well-established that the usual practice is to dismiss the state supplemental claims without prejudice. *Groce v. Eli Lilly & Co.*, 193 F.3d 496, 501 (7th Cir. 1999).

Mr. Oyebade asserts state law claims for intentional infliction of emotional distress, negligent infliction of emotional distress, breach of contract, and promissory estoppel. The Court concludes that the factors it must consider weigh in favor of it continuing to exercise supplemental jurisdiction over Mr. Oyebade's state law claims. This case has been pending in federal court for nearly two years and, having devoted substantial time resolving numerous issues along the way, the Court is very familiar with the underlying facts of the remaining state law claims. While it has no doubt that a state court could get up to speed, judicial economy, convenience, and fairness favor this Court continuing to exercise jurisdiction, particularly since Boston Scientific's summary judgment motion is fully briefed. Comity does not weigh against retaining jurisdiction because the state law claims do not raise novel legal issues, and the Court is capable of applying relevant state law to those claims. Therefore, the Court concludes that these factors weigh in favor of it continuing to exercise supplemental jurisdiction over Mr. Oyebade's state law claims. The Court will address each claim in turn.

### 1. *Intentional Infliction of Emotional Distress*

Boston Scientific argues that termination of employment cannot form the basis for an intentional infliction of emotional distress claim under Indiana law and that to the extent Mr. Oyebade bases his claim on Boston Scientific's payment of three bereavement days instead of five or on its treatment of co-workers' complaints regarding Mr. Oyebade's body odor, those allegations do not support a finding that Boston Scientific's conduct was "utterly intolerable" as required for an intentional infliction of emotional distress claim. [Dkt. 141 at 26-27.] Mr.

Oyebade responds that "[t]here is no question about whether [he] suffered any emotional distress during and after his employment with Boston Scientific," and that he will offer certain evidence of that emotional distress at trial so his claim will fare better then. [Dkt. 146 at 21.]

To prove his claim of intentional infliction of emotional distress, Mr. Oyebade must establish that Boston Scientific: "(1) engage[d] in extreme and outrageous conduct (2) which intentionally or recklessly (3) cause[d] (4) severe emotional distress to [the plaintiff]." *Curry v. Whitaker*, 943 N.E.2d 354, 361 (Ind. Ct. App. 2011).  Liability for intentional infliction of emotional distress "has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Bradley v. Hall*, 720 N.E.2d 747, 753 (Ind. Ct. App. 1999).

Mr. Oyebade has not put forth any evidence showing that Boston Scientific acted with an intent to harm him emotionally, or recklessly did so.  Instead, Mr. Oyebade simply states that he will put forth evidence at trial that he suffered emotional distress and that his claim will fare better there.  But "[s]ummary judgment is not a dress rehearsal or practice run; it 'is the put up or shut up moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of the events.'" *Hammel v. Eau Galle Cheese Factory*, 407 F.3d 852, 859 (7th Cir. 2005) (citations omitted).  Mr. Oyebade cannot defeat summary judgment by promising to present evidence at trial – he must do so now, and has not.[10]  Accordingly, his intentional infliction of emotional distress claim fails as a matter of law.

---

[10] Even if Mr. Oyebade could show that Boston Scientific intended to inflict emotional distress, the Court finds that terminating his employment, paying him for three days of bereavement instead of five (when he was entitled to zero), and speaking to him about his co-workers' complaints regarding his body odor do not come close to rising to the level of "extreme and outrageous" conduct – a necessary element of an intentional infliction of emotional distress claim.

### 2.   *Negligent Infliction of Emotional Distress*

As for Mr. Oyebade's negligent infliction of emotional distress claim, Boston Scientific asserts that such a claim is limited to two situations – where a plaintiff has either "witnessed or come to the scene soon thereafter the death or severe injury of certain classes of relatives…or…suffered a direct impact…."  [Dkt. 141 at 27.]  It argues that Mr. Oyebade's has not alleged either of these scenarios.  [*Id.*]  Mr. Oyebade responds in the same fashion as with the intentional infliction of emotional distress claim, simply stating that he will present evidence that he has suffered emotional distress at trial.

The Court agrees with Boston Scientific that in Indiana actions seeking damages for negligent infliction of emotional distress have been recognized in two situations: "where the plaintiff has (1) witnessed or come to the scene soon thereafter the death or severe injury of certain classes of relatives (i.e., the bystander rule...) or (2) suffered a direct impact (i.e., the modified impact rule…)."  *Spangler v. Bechtel*, 958 N.E.2d 458, 466 (Ind. 2011).  Mr. Oyebade has not even remotely alleged that either of these circumstances were present, nor has he responded to Boston Scientific's argument that those allegations are lacking.  [*See* dkt. 57 at 25-28, ¶¶ 119-129.]  For this reason, his negligent infliction of emotional distress claim fails.

### 3.   *Breach of Contract*

Mr. Oyebade's breach of contract claim appears to be based solely on his allegation that Boston Scientific did not promptly reimburse him for his tuition, but did so fourteen months after he requested reimbursement.  [Dkt. 57 at 31-32, ¶¶ 143-147.]  Boston Scientific argues that there was never a contract between it and Mr. Oyebade requiring it to reimburse him for his tuition, let alone within a particular time period.  [Dkt. 141 at 28-29.]  Mr. Oyebade responds that his claim

will fare "well at trial," and states that he "relied on the job offer and its promises…." [Dkt. 146 at 21-22.]

In order for Mr. Oyebade to succeed on his breach of contract claim, he would have to show that there was a contract requiring Boston Scientific to reimburse him for tuition, that the reimbursement had to take place within a certain time frame, and that Boston Scientific did not pay within that time period. *See Corry v. Jahn*, 972 N.E.2d 907, 913 (Ind. Ct. App. 2012) (elements of breach of contract claim are "the existence of a contract, the defendant's breach thereof, and damages"). Mr. Oyebade's offer letter stated that "Boston Scientific is willing to reimburse you for otherwise unreimbursed educational courses in which you are currently enrolled and attending as of your date of hire. To be eligible for this reimbursement, you must complete an Educational Assistance Request and Approval Form and an Agreement to Reimburse on your date of hire or as soon as possible thereafter, not to exceed ten (10) business days from your date of hire…." [Dkt. 140-2 at 12.]

Even if the language in the offer letter constituted a contract requiring Boston Scientific to reimburse Mr. Oyebade, and even assuming Mr. Oyebade complied with the requirements regarding timely submitting his reimbursement request, it is undisputed that the offer letter does not provide a deadline by which Boston Scientific must reimburse tuition. Additionally, it is undisputed that Boston Scientific eventually reimbursed Mr. Oyebade for his tuition. [*See* dkt. 146 at 21-22.] Accordingly, because the offer letter did not provide a deadline for reimbursement, and since Boston Scientific did eventually reimburse Mr. Oyebade for his tuition, his breach of contract claim fails.

### 4. *Promissory Estoppel*

Mr. Oyebade claims that Boston Scientific promised him that his "employment will be secured for at least 2 years" if he agreed to move to Indiana and begin working at Boston Scientific. [Dkt. 57 at 28, ¶ 130.] He also alleges that Boston Scientific promised him "a work place free of hostilities and racial harassments…[with] equal treatment and accessibility to key employee benefits…." [*Id.* at 29, ¶¶ 132-133.] Boston Scientific argues that Mr. Oyebade's promissory estoppel claim fails because the offer letter expressly states that his employment was at-will and that either he or Boston Scientific could terminate it at any time. [Dkt. 141 at 28.] Mr. Oyebade again responds that his claim will fare well at trial, and only asserts that he "relied on the job offer and its promises…." [dkt. 146 at 22.]

Under Indiana law, a claim for promissory estoppel requires "(1) a promise by the promissor; (2) made with the expectation that the promisee will rely thereon; (3) which induces reasonable reliance by the promisee; (4) of a definite and substantial nature; and (5) injustice can be avoided only by enforcement of the promise." *Brown v. Branch*, 758 N.E.2d 48, 52 (Ind. 2001). Mr. Oyebade's promissory estoppel claim fails at the start because he has not presented any evidence that Boston Scientific promised him employment for a minimum of two years. To the contrary, the offer letter provided that "[u]pon acceptance of this offer and your active start of employment; you will become an 'at will' employee of Boston Scientific. This means that you will be free to resign at any time. Likewise, Boston Scientific will have the right to terminate your employment at any time with or without reason or notice. Acceptance of this offer acknowledges your understanding and acceptance of the 'at will' nature of your employment." [Dkt. 140-2 at 12-13.] Even construing the facts in favor of Mr. Oyebade, as the Court must do, there is simply no evidence that his employment was anything but at-will. Without evidence of a

- 34 -

promise that the employment would last for two years – which is what Mr. Oyebade expressly based his promissory estoppel claim on – the claim fails as a matter of law.[11]

### F.  Boston Scientific's Counterclaims

Boston Scientific has moved for summary judgment on its counterclaims against Mr. Oyebade for fraud, constructive fraud, and abuse of process in connection with Mr. Oyebade's request for, and receipt of, bereavement leave when he did not in fact go to Africa to mourn his father, and for pursuing allegations in this lawsuit relating to Boston Scientific's initial payment of three days of bereavement instead of five.[12]  [Dkt. 104 at 26-28, ¶¶ 20-33.]  Mr. Oyebade does not respond to Boston Scientific's arguments regarding its counterclaims.

### 1.  Fraud

To prove a fraud claim under Indiana law, Boston Scientific must demonstrate: (1) a material misrepresentation of past or existing fact; (2) which was untrue; (3) which was made with knowledge of or in reckless ignorance of its falsity; (4) which was made with the intent to deceive; (5) which was rightfully relied upon by the complaining party; and (6) which proximately caused the injury or damage complained of.  *Doe v. Howe Military Sch.*, 227 F.3d 981, 990 (7th Cir. 2000).  "Actual fraud may not be based on representations regarding future conduct, or on broken promises, unfulfilled predictions or statements of existing intent which are not executed." *Id.*  Although a statement of present intention or state of mind will support a claim of actual fraud in some jurisdictions, Indiana has explicitly rejected that rule.  *Peoples Trust Bank v. Braun*, 443 N.E.2d 875, 877-79 (Ind. Ct. App. 1983); *see also Mudd v. Ford Motor Co.*, 178 Fed. Appx. 545, 547 (7th Cir. 2006).

---

[11] The Court further finds that Mr. Oyebade's claim fails on the injustice element as well, given Mr. Oyebade's work history.

[12] For the same reasons the Court will continue to exercise jurisdiction over Mr. Oyebade's state law claims, it will also retain jurisdiction over Boston Scientific's state law counterclaims.

Boston Scientific's fraud counterclaim fails to the extent it is based on Mr. Oyebade's statements when he requested the bereavement leave that he would be going to Africa to mourn his father, because those statements were about his future actions. *Do*e, 227 F.3d at 990. However, Boston Scientific also bases its fraud claim on Mr. Oyebade's pursuit of an extra two days of bereavement leave after he returned, asserting that it was fraud for him to seek more leave when he knew that he was not entitled to any since he had not actually travelled to Africa. [Dkt. 149 at 19.] The Court finds that Boston Scientific is entitled to summary judgment on its fraud claim based on Mr. Oyebade's continued representations after his leave that he had travelled to Africa to mourn his father and so was entitled to five days of bereavement leave instead of three. His statements regarding how he spent his leave were undisputedly untrue, he knew they were untrue, he made them with intent to deceive Boston Scientific, Boston Scientific justifiably relied on his misrepresentations, and his misrepresentations proximately caused Boston Scientific to pay him for five days of bereavement leave. Accordingly, the Court finds that Boston Scientific is entitled to summary judgment on its fraud counterclaim, and should be awarded the value of the five days bereavement leave it provided to Mr. Oyebade.[13]

### 2.  Abuse of Process

Boston Scientific asserts that Mr. Oyebade included false allegations regarding his entitlement to bereavement leave "with the ulterior purpose or motive of damaging Boston Scientific's integrity and reputation and exerting money from Boston Scientific to which he is not entitled." [Dkt. 104 at 27-28, ¶ 31.] It alleged that it has incurred unwarranted costs of defense and

---

[13] Boston Scientific's constructive fraud counterclaim also relates to its payment of five days of bereavement to Mr. Oyebade. [Dkt. 104 at 27, ¶ ¶ 25-30.] Because the Court has found that Boston Scientific succeeds as a matter of law on its fraud counterclaim, and that counterclaim seeks the same remedy (repayment of the bereavement leave), it need not decide whether Boston Scientific succeeds on the constructive fraud counterclaim as well.

damage to its integrity and reputation.  [*Id.* at 28, ¶ 33.]  Mr. Oyebade does not respond to Boston Scientific's request for summary judgment on its abuse of process counterclaim.

      To maintain an abuse of process claim, the plaintiff must prove: "(1) an ulterior purpose or motive and (2) a willful act in the use of process not proper in the regular conduct of the proceeding." *Kalwitz v. Kalwitz*, 934 N.E.2d 741, 753 (Ind. Ct. App. 2010).  "The second element, stated differently, involves an inquiry as to whether the use of process was a legitimate use of the judicial system." *Id.* (*quoting Reichhart v. City of New Haven*, 674 N.E.2d 27, 32 (Ind. Ct. App. 1996)).  "A party may not be held liable for abuse of process if the 'legal process has been used to accomplish an outcome which the process was designed to accomplish.'" *Watson v. Auto Advisors, Inc.*, 822 N.E.2d 1017, 1029 (Ind. Ct. App. 2005) (*quoting Reichhart*, 674 N.E.2d at 31).

      Here, the only "ulterior motive" Boston Scientific alleges is that Mr. Oyebade intended to damage Boston Scientific's integrity and reputation and exert money from Boston Scientific to which he was not entitled.  Boston Scientific's mere allegations are not enough to warrant summary judgment. It must introduce admissible evidence, and such evidence must negate all reasonable inferences in favor of Mr. Oyebade.  First, Mr. Oyebade sought the bereavement leave – and pursued the extra two days – before the action was initiated.  Accordingly, misrepresenting the purpose of his leave in order to get paid for bereavement leave took place before this lawsuit and cannot form the basis of an abuse of process of claim.  Second, while Boston Scientific alleges in its counterclaim that Mr. Oyebade intended to damage its integrity and reputation, it does not cite to any evidence in the record which supports that allegation.  Indeed, it appears from the evidence that Mr. Oyebade initially misrepresented that he travelled to Africa to obtain pay for part of his leave, then continued to perpetuate the misrepresentation after initiating this

lawsuit to bolster his discrimination claims.  There is no evidence that he did so to damage Boston Scientific's integrity or reputation.

While the Court recognizes the impropriety of using false allegations to pursue a claim, it finds that Boston Scientific has not presented sufficient evidence to succeed on its abuse of process counterclaim.  Abuse of process simply is not the correct avenue to recover against Mr. Oyebade for using a false allegation to support his claims.  Accordingly, the Court denies summary judgment on the abuse of process counterclaim.  An order regarding the continued viability of this counterclaim will enter this same day.

## V.
### CONCLUSION

For the foregoing reasons, the Court **DENIES** Mr. Oyebade's Motion to Supplement Response/Answers to Defendant's Motion for Summary Judgment.  [Dkt. 153.]  Further, the Court **GRANTS** Boston Scientific's Motion for  Summary Judgment, [dkt. 140], in full to the extent it relates to Mr. Oyebade's claims against it, **GRANTS** the motion on Boston Scientific's fraud counterclaim, **DENIES AS MOOT** the motion on Boston Scientific's constructive fraud counterclaim, and **DENIES** the motion on Boston Scientific's abuse of process counterclaim.

The Court is unable to locate any information in Boston Scientific's briefs regarding the specific amount it seeks in connection with its fraud counterclaim.  Boston Scientific is **ORDERED** to submit a statement setting forth the specific amount of damages it seeks (*i.e.*, the amount which corresponds with five days of bereavement leave) within **ten days** of the date of this Order.  Mr. Oyebade may respond to any such statement within **fourteen days** of the filing of the statement, and Boston Scientific shall file any reply within **seven days** of Mr. Oyebade's response.

06/28/2013

Hon. Jane Magnus-Stinson, Judge
United States District Court
Southern District of Indiana

**Distribution via ECF only**:

Joseph C. Pettygrove
FAEGRE BAKER DANIELS LLP - Indianapolis
joseph.pettygrove@FaegreBD.com

Daniel G. Wilczek
Faegre Baker Daniels LLP
Daniel.Wilczek@faegrebd.com

**Distribution via U.S. Mail**:

ADENIRAN OYEBADE
2910 Citrus Lane
Upper Marlboro, MD 20774

- 39 -